Evelyn Julia ATWOOD et al., Appellants,

v.

E. G. RODMAN et al., Appellees.

Mary A. ALLISON et al., Appellants,

v.

E. G. RODMAN et al., Appellees.

Kathaleen BRAWLEY et al., Appellants,

v.

E. G. RODMAN et al., Appellees.

Nos. 5479–5481.

Court of Civil Appeals of Texas.

El Paso.

Jan. 24, 1962.

Rehearing Denied Feb. 28, 1962.

Turpin, Kerr, Smith & Dyer, Midland, Bill Kimbrough, Odessa, McDonald, Sanders, Nichols, Wynn & Ginsburg, Edwards, Shannon & West, Fort Worth, B. Reagan McLemore, Longview, Orr & Orr, Fort Worth, Kerr & Gayer, San Angelo, Carrington, Johnson & Stephens, Dallas, Neill, Blanks, Lewis & Logan, San Angelo, Morrison, Dittmar, Dahlgren & Kaine, San Antonio, Golden, Croley, Howell, Johnson & Mizell, Dallas, Thompson, Walker, Smith & Shannon, Fort Worth, for appellants.

Shepperd & Rodman, Odessa, Folley, Snodgrass & Calhoun, Amarillo, for appellees.

Finley & Scogin, Kermit, Johnson & Baker, Austin, for amicus curiae.

FRASER, Justice.

The three cases here appealed are suits in trespass to try title brought by E. G. Rodman and W. D. Noel, as surface owners of all of the lands involved, against Evelyn Julia Atwood, Mary A. Allison, Kathaleen Brawley, and many other individuals, corporations and institutions, as mineral owners under one or all of Sections 2, 8 and 10, in Block 44, Township 3 South, T. & P. Ry. Co. Survey, Ector County, Texas. We have been favored in this case with amicus curiae briefs on behalf of the Texas Landowners Protective Association and on behalf of the Texas and Southwestern Cattle Raisers' Association and Texas Sheep and Goat Raisers' Association.

This controversy arose by virtue of the fact that the plaintiffs-appellees claim ownership to the surface estate of the lands involved herein. This fact is not controverted, but the dispute is concerned with what is included in the surface estate and the "oil, gas and other minerals." Between the years 1926 and 1936, R. L. (Buck) York granted and leased to, or reserved from, various people mineral and royalty interests on the property or parts of the property here involved. These instruments used the term "oil, gas and other minerals."

The plaintiffs attempted to sell large quantities of limestone, on the three sections here involved, to the Southwest Portland Cement Company, but the cement

company refused to recognize, for purpose of payment, the surface owners or owners of the surface estate as being the owners of the limestone. Plaintiffs brought this suit in trespass to try title against the defendant-appellants, seeking recovery of the "surface estate, including all sand, clay, gravel, caliche and limestone and all water and water rights," in the respective tracts, and the appellants answered with general denials and pleas of not guilty. All of the three cases above styled in this opinion were tried to the court without a jury. Judgment was entered for the plaintiffs (surface owners), but such judgment limited the plaintiffs' recovery to sand, clay, gravel, caliche and limestone, (1) which may be recovered or removed by the open pit or quarry method, and (2) conditioned that same would not include such substances when removed for the purpose of extracting pure mineral substances, such as iron, aluminum, gold, silver, and like substances; but the minerals used in the manufacture of cement were not included as such a pure mineral substance.

It can readily be seen, therefore, that this lawsuit is concerned with just one thing—namely, when R. L. York executed the various instruments conveying and/or reserving minerals, royalties, etc., did he, by such instruments, convey or reserve the limestone on the three sections involved herein? In other words, does the limestone and caliche belong to the owners of the surface estate, or to the owners and holders of the mineral estates or rights? We will not refer further to the various instruments in the record, as there is no dispute about their wording, nor are they necessarily informative for the purpose of this opinion, other than to present the problem by the use of the term "oil, gas and other minerals."

The court made a number of findings of fact and conclusions of law, and we think it advisable to include a résumé of the same here, as follows: The court found that the sand, clay, gravel, caliche, limestone and water involved in this suit are not minerals within the ordinary and natural meaning of the word "minerals"; that they are not rare and exceptional in character and do not possess a peculiar value which would give them a special value or classification; that limestone suitable for the manufacture of cement is to be found in vast abundance in the state of Texas; that the limestone involved in this case underlies most, if not all, the land involved and may be removed by scraping off the topsoil and an overlying layer of caliche; that the limestone outcrops in places and is sometimes found on the surface; that, generally, caliche in this area is often found at the surface and is about ten feet thick, the limestone being found in a layer underneath about fifteen feet thick; that the caliche and limestone, as well as the sand, clay and gravel, are so closely related to the soil and so nearly a part of the surface of the soil itself that they are reasonably and ordinarily considered a part of the soil belonging to the surface estate, rather than a part of the minerals or mineral rights; that they can be removed only by quarrying or the open pit method, which destroys the surface for agricultural and grazing purposes; that such land is ranch land, contained in a big ranch recently used for grazing purposes; that the land involved is situated in a limestone country covering most of Ector County and surrounding counties, as well as what is known as the Hill Country; that the limestone here is of the same character as that in other sections of Texas; that to construe the words "and other minerals" in said deeds as including sand, clay, gravel, caliche, limestone and water would be an unreasonable construction of said deeds, and would be inconsistent with the grant of the oil, gas and other minerals because it would result in conveying the surface estate along with the oil, gas and other minerals, contrary to the intention of the parties to the instruments; that limestone

of the same character is presently being sold for road-building, from sections near this land, for as much as four cents per cubic yard; that the selling price the appellees would here receive would only net them about one-fourth of a cent per cubic yard; that, therefore, the limestone here involved is not as valuable, or any more valuable, than adjacent limestone being sold and used for building and road-making purposes.

Further, the trial court found that the building of a cement plant near the land involved herein increased the market for clay, caliche and limestone and the value thereof, but such did not change the character of the same from the ordinary meaning within the term of the grants so as to constitute them as minerals within the meaning of the grants, and such was not the intention of the parties; that the fact that such substances may be used for manufacturing cement does not convert them into minerals; that cement itself is not a mineral; that during the time of the conveyances of the oil, gas and other minerals —in other words, when they were severed from the surface estate—there was great activity and play in leases and conveyances of minerals and royalty interests in Ector and adjoining counties; that such interests were changing hands from day to day, and the thought uppermost in the minds of the parties to such deals was the exploration and production of oil and gas, and that little or no thought was given at that time to the surface estate, or the sand, clay, gravel, caliche and limestone. Also, the trial court found that the layer of caliche near the surface contains about sixty per cent calcium carbonate, and the limestone beneath about seventy-five per cent calcium carbonate; that the caliche, by the weathering process, has lost some of its calcium carbonate, but both still have the same constituents, but in different percentages of calcium carbonate and other elements suitable and necessary for manufacturing cement; that the cement may be manufactured by using caliche without the use of limestone, and vice versa; that both caliche and limestone are rock, and not minerals, as that term is used in its natural and ordinary sense.

We believe that the findings above described are substantially supported by evidence of probative value.

Otto P. Kroeger has been employed by the cement company since 1926 and is now division superintendent. He testified that he had continuously educated himself in cement manufacturing; that the limestone in the area involved here is about twenty feet from the surface; that caliche lies on top of the limestone and is low-grade limestone, but both are used to make cement; that you have to have caliche, as well as limestone, to make cement; that the company imports slag, as the local materials are slightly deficient in iron; that he selected the site on Section 3, adjacent to the land here involved, and that the most important factor was the location with respect to the center of the sales area, which was in the Permian Basin; that other considerations were accessibility of railroad and highway transportation and the availability of water, power and fuel; that these were considerations, as well as the presence of materials that would make the type of cement they wished. He also testified that the caliche contains sixty to seventy-five per cent calcium carbonate, and the high-grade limestone in their location would run eighty to ninety per cent calcium carbonate. He testified that raw materials for making Portland cement are abundant in this state; that the limestone and caliche being used by his company are not rare or special in character; that they are using ordinary limestone similar to that which he had testified as being abundantly found in the state. He then testified at length as to the method of extracting the limestone, which is quarrying, and estimates that his company pays approximately one-fifth of a cent per ton for the limestone; a limestone that would be rare and exceptional

would be limestone that had the exact chemical composition desired by one who manufactures Portland cement; that he knew of none such in the state of Texas; that the technology of Portland cement has increased tremendously since the early days; that the technological advances have broadened the type of raw materials now usable. He says, "We call limestone a rock. Limestone is a rock." He further testified that they bring up the top soil with the caliche; that the chemical composition of the top soil was not adverse and, to use his words, "The topsoil ends up in the cement bag."

Another witness, Palmer Willis, testified that the three sections are valuable and suitable for agricultural purposes; that he had majored in Animal Husbandry in college; that he had seen cattle grazing in this area.

Dr. William P. Mather, a consulting geologist and chemist, testified that there is, in this area in Texas, an abundance of materials available for the production of Portland cement, and referring to a map described as plaintiffs' Exhibit B, a geological map published by the University of Texas, stated that it represents various formations and outcrops in Texas; that there are 101 counties with limestone outcropping at the surface, and 52 other counties where caliche outcrops; that a vast majority of the limestone formations in the state are suitable for the production of Portland cement; that he didn't know of any that could be called limestone that wasn't suitable; limestone that can be made into Portland cement is not rare and scarce, but abundant, as illustrated by the olive-drab colors on the map; that this is limestone country, the whole Hill Country is limestone country, through Junction, Kerrville, Sonora and Ozona and right in here, and extending up into Upton County; this entire area in Texas is composed of limestone suitable for making Portland cement; that caliche is weathered limestone; that the important elements in lo-

cating a cement plant are market, water and fuel, transportation, and then raw materials; that raw materials are easier to find than markets; that limestone and caliche are obtained in Texas only by quarrying; that the primary constituent of limestone is calcium carbonate, and the same is true of caliche; that rock that has calcium carbonate is not a mineral, but such rock is called tachylyte, and the mineral is called hematite; that limestone is rock and is composed of minerals; that if one should go out here and pick up a handful of this dirt, it would also be composed of minerals; that when you take the limestone out, you destroy the surface.

Witness Clyde Chisum is an instructor in geology in Odessa College, and has been for seven years, holding a degree of B. S. in Geology. During his presence in this area he had studied caliche and limestone deposits, making numerous trips; that limestone is abundant in this area; that this is a limestone country without reservations at all; that caliche is abundant in this area; that caliche is weathered limestone; that calcium carbonate is the principal component of limestone; that limestone is a rock; that mineral does not fit at all in this classification; that you cannot write a definite chemical formula for limestone; that calcium carbonate, spoken of as being in rocks, is not a mineral; that scientific teachings would treat the components of limestone as not being mineral.

Judge Paul Moss has lived in Ector County thirty-four years, and had an abstract business for twenty-nine years, up until two years ago; that he had been County Attorney and was the first District Judge in the county; that, from his thirty years' experience in Ector County, where he has owned land and mineral and surface estates, and both together, and from his own knowledge and experience, the owners of the surface estate in this county have treated caliche and limestone

as part of their surface property; that there is an abundance of caliche and limestone in the county; that the removal of caliche and limestone destroys the surface; that he sells limestone for road material; that he knew R. L., or "Buck", York very well; that he felt that when these transactions here involved were consummated, the parties did not have limestone or caliche in mind; that at that time he had an abstract plant and that he probably did a little business with every major oil company in the state, and, as a lawyer, closed deals; and nobody, to his knowledge, was referring to caliche and limestone; that Buck York was one who went along with the crowd and did what was customary, and that he felt that Buck York never had in mind any royalty on caliche or anything like that, and had no intention of disturbing the surface or trying to convey it; that out here in this country it has always been customary that your surface owners had the rock and caliche and things like that, and that he (meaning Mr. York) was the man who sold it—not the oil and gas owners; that there was quite a boom from 1926 to 1935, and that people were interested in oil and gas; and, lastly, that the mineral owners do not participate in the money he receives for his crushed limestone.

Also, William A. Waldschmidt, a witness introduced by the appellants, who was a consulting geologist in Midland, testified that limestone was quite prevalent in the vast olive-drab area on the University of Texas map (plaintiffs' Exhibit B), heretofore referred to, and that if someone were to testify that limestone is found in vast abundance in that area, he would not disagree too much. He also testified that calcium carbonate is present in caliche, and if more than fifty per cent is present in rock, he would refer to it as limestone.

We have included summaries of these witnesses' testimony to illustrate our opinion that the court had substantial evidence of probative value to support and justify its findings.

We believe that the trial court reached the right conclusion. First of all, we will try to deal with the matter of the intent of the parties. It is elementary that the intent of the parties to an instrument is the all-important factor. The actual paper or writing, in the final analysis, merely represents what the parties believe they have conveyed or contracted. Therefore, the meeting of minds or intention is the component of these instruments, to which full and intelligent effect should be given. In the case before us, it is our belief, and we so hold, that by the term, "other minerals", the grantor or grantors in the instruments herein involved did not intend to, and in effect did not, convey the limestone or caliche or surface shale. It will be noticed that the testimony of Judge Paul Moss substantially upholds this finding, as he talks about the customs of that period, the environment and habits of Mr. York, the grantor, and his own experience as rancher, oil man and abstracter. It is also elementary that Texas has long been considered a state recognizing the rule of two estates in real property, i. e., mineral and surface. Now, the testimony of the witnesses amply illustrates that if limestone is here adjudicated, and was intended in the original instrument, to be a mineral, then the attempt of the grantor to convey or reserve the surface estate was a futile and facetious thing, because it is uncontested that the removal of the limestone, caliche and shale destroys the surface. As one witness said, you cannot ranch or graze cattle in a caliche pit. Now we have the grantor, resident of a two-estate jurisdiction, deliberately and with obvious intent separating the surface estate from the mineral estate. His intent, therefore, must have been not to include limestone with the minerals, because he did not so specifically state, nor had such been the custom in this state or that area. Nor have caliche and limestone, so far as we know, been found to be minerals, in and during the long years that the same have been used for roadbuilding and construction work. The at-

tempted classification of limestone and caliche as minerals seems to have arrived simultaneously with the erection of a twelve-million-dollar cement plant directly adjacent to the area involved. Further, to attempt to construe these instruments and the intent therein on the restricted basis of definitive word-meaning, to our minds, is neither feasible nor proper, because this record itself, as well as the citations in the many cases cited in the record, shows that there is an irreconcilable variation among and between those who have tried to define the word "mineral." Geologists, scientists, courts, legislatures, dictionaries, and even encyclopedias, do not agree on the meaning of the word. For example, witness Chisum, the professor of geology, says that oil and gas themselves are not minerals, and if technical definitions only were applied, it might be alarming to contemplate the meaning of an instrument that conveyed oil, gas and other minerals, if his definition were accepted at full face value. But it has long been a legal custom to give effect to the parties' intent, although they might mis-describe something or misunderstand its technical definition. The same is true of legal actions and pleadings. A lawsuit is what it is—not always what the pleader says it is; as, for example, a suit might be entitled one in trespass to try title in order to retain jurisdiction, when in truth and effect it was a suit on a contract.

In the 1962 pocket parts, Texas Jurisprudence, Volume 31–A, page 3, we find the following statement, which apparently collaborates with, and is derived from, statements in 37 A.L.R.2d 1340:

"And in wills, conveyances and reservations, the words 'mineral rights' are to be interpreted according to their ordinary and natural meaning when there is nothing in the instrument which indicates use in a technical or scientific sense. This is the established rule in the absence of clear indication otherwise, because it gives effect to the intention of the testator or other maker of an instrument who is presumed to be familiar with the ordinary and natural meaning of the words used.

"* * * While limestone is technically a mineral, the physical characteristics and elements of these several substances being substantially the same, limestone, like the others, being found in a *natural surface situation* that warrants its consideration as a part of the surface rather than as part of the mineral estate. Heinatz v. Allen (1949) 147 Tex. 512, 217 S.W.2d 994 * * *." (Emphasis ours.)

In Winsett v. Watson, Tex.Civ.App., 206 S.W.2d 656 (writ refused), which case is mentioned in the Heinatz case, we find this statement:

"* * * It was held that the better rule is that each case must be decided on the language of the grant or reservation, the surrounding circumstances and the intention of the grantor if it can be ascertained."

In Psencik v. Wessels, Tex.Civ.App., 205 S.W.2d 658 (writ refused), which is a sand and gravel case, Chief Justice McClendon, in his opinion, makes this observation:

"We have reached the conclusion that sand and gravel was not included in the reservation, which we base upon the following considerations: 'While the word "minerals" includes, in a technical sense, all natural inorganic substances forming a part of the soil, the term is used in so many senses, dependent upon the context, that such a definition is obviously too broad, for it would throw little, if any, light on what was meant in a particular case. So, to apply the word in the signification in which it is employed in the scientific division of all matter into the traditional three kingdoms to a grant of land containing an exception of the minerals, would be absurd, since all land belongs to the mineral kingdom, and the exception could not be given

effect without destroying the grant.'
36 Am.Jur., p. 283."

Then, later, after discussing the various texts and authorities, Judge McClendon further says:

"* * * No doubt every inorganic component of the earth's crust is legally cognizable as mineral, *if the parties affected choose so to deal with it;* and this no doubt is true regardless of whether it may be removed or extracted for commercial or other profitable purposes. We know of no rule which would deny the owner of the soil the right to sever the title of any such component from the general title to the soil. Such severance would unquestionably constitute a mineral title. The term 'legally cognizable as minerals' must therefore be restricted *to such minerals and mineral substances as are commonly regarded as minerals as distinguished from the soil in general.* We have examined many cases and texts and we do not find that either sand or gravel is generally regarded as a mineral within the general term 'all minerals', unless there is something in the context or surrounding circumstances to so indicate." (Emphasis ours).

While this is a limestone case, we, too, have examined the authorities and cannot find, as we have indicated above, that limestone is *generally* regarded as a mineral. It certainly hasn't been so regarded according to this record, in a multitude of cases and areas where it has been used for building purposes and the building of roads. There is evidence from a witness that the better class of limestone is valuable for high-class building purposes, and much more valuable for such use than for use in the manufacture of cement. Nor can we say here that the presence of the recently built cement plant (1958) could, in any way, make limestone a mineral at the time of these instruments (1926 to 1936). We think it abundantly clear that, at the time of the execution of the instruments involved herein, the grantors, and probably the grantees themselves, were preoccupied with the exploration for oil and gas, and the use of the term "other minerals" did not include chemical or mineral components of the surface, or a rock known as "lime-stone", containing chemical or mineral elements that were useful in making cement. We believe that this man, York, the author of these instruments, did, according to the evidence before us, make his conveyances and reservations in keeping with the customs, usages and judicial environment of that area and time. There is no showing that Mr. York was any sort of a special scientist or technician, but the showing is all to the contrary— that he was an ordinary, normal, ranch and oil-man of that area and time, and we therefore believe that he had no intention, when he severed these two estates, of deliberately creating potential ruin of all of the surface by including limestone and caliche in the term "other minerals". Otherwise there would have been no point in severing the two estates, because he would have been conveying, or reserving, something in an instrument that provided for the destruction of the very things he was trying to convey or reserve. Therefore, because there is no evidence here of any intent to use the words "other minerals" *in their strict technical sense,* or any evidence that any special consideration had been given to the matter of caliche and limestone, we hold that the parties to the instruments here involved did not intend, in the granting or reserving of mineral rights, to include limestone, caliche or surface shale. We further hold that, such being true, there is not sufficient legal reason to hold that limestone, caliche and surface shale were, by law, included; therefore, we hold that they were not included, either by intent or legal interpretation.

We turn now to the positions of the various parties to this controversy, as evidenced by the very able briefs of appellants, appellees, and amicus curiæ, as to what limestone really is. There are many cases in

the briefs holding that "other minerals" means valuable minerals which are not a part of the soil, and can be mined without destroying the soil. In the case of Cronkhite v. Falkenstein; 352 P.2d 396, the Supreme Court of Oklahoma deals with this same problem with respect to gypsum. In one of the briefs, gypsum is referred to as one of the minerals used in the final manufacture of cement, and this same brief states that there is a great similarity in the physical character and chemical content of gypsum and limestone. This court said:

"We conclude that by the use of the words in the mineral deed, 'oil, gas', preceding other minerals, the latter term embraced only minerals of the same generic class as oil and gas, and did not include gypsum rock."

Again we mention that, in Texas, we have always recognized the two estates of surface and mineral, and the very word "limestone" has considerable generic significance, as well as semantic importance. The Supreme Court of Mississippi, in Witherspoon et ux. v. Campbell, 219 Miss. 640, 69 So.2d 384 (which was a gravel case), says as follows:

"Of course, the ordinary oil and gas lease refers to the minerals that are to be explored for as being 'oil, gas and other minerals', and under the doctrine of ejusdem generis the words 'and other minerals' have reference to other minerals of like kind and character which are not a part of the soil, such as the oil and gas specifically mentioned. * * * We, therefore, think that it is clearly to the public interest, and a matter of fairness to a great majority of the landowners of this state and future purchasers of land, that if the term 'minerals' is to include all of the gravel on the land the conveyance should specifically so declare."

There is reference here made, also, to our earlier statements with reference to the matter of intent. We do not believe that limestone which, according to the witnesses here, is shoved into the kiln along with caliche, dirt, and even some bushes, is to be or should be considered as a mineral. It is true it does contain chemical elements that make it useful in the manufacture of cement. It might be noted, for what it is worth, that these elements are not extracted, but that the whole rock and caliche and dirt content goes in, and emerges later as cement, and that the various components are not extracted and the substantial part of the rock thrown away. We therefore hold that limestone was not a mineral, or such a material as was contemplated by the term "other minerals", used in the instruments. Nor do we think that it is established that, because of the great progress in technical and scientific research, limestone has become a mineral as of today. We believe it to be a rock-like part of the surface, found in abundance in a hundred counties in the State of Texas, and useful in the making of cement, as well as for road-building and other types of building.

█ Much has been said and urged that usage has made limestone a mineral. We do not accept this statement, as indicated above. Further, if the court should so find, then, after science and technology find new uses, both as major elements or offsetting elements, for various components of the earth or its surface, all contracts would again have to be re-examined, and the owners of surface and mineral estates would not know, now or then, the exact perimeters of what they hold. As we have held above, and hold here, we think the intent at the time of the transaction governs and controls the extent of the conveyances or reservations. Certainly, usage cannot re-write, supplement or alter a contract made many years before, without the consent of the contracting parties. It will be remembered that Judge Moss testified that his limestone is similar and adjacent to that here involved, and the evidence developed that he was getting much more money for his limestone, which was being

sold and used for road-building; and it is interesting to note that Judge Moss observed that no royalty was being paid on any of the limestone from his property being used for building purposes. To hold that usage controls would make for hopeless confusion, because if limestone is—as the witnesses testified—highly useful and valuable in building and construction, then there would be an inevitable conflict between those who claim that it is a mineral and want to use it for cement, and those who claim that it is rock used for construction. We quote from a statement in one of the briefs of the Heinatz case (to be hereinafter considered), where the petitioners state, after alleging that limestone can be made into cement:

"* * * If limestone which may be used for cement meets the test of 'rare and exceptional character' and possesses 'a peculiar property' giving a 'special value', then the building stone which is more valuable and of rare and exceptional character certainly should come within the classification of minerals for the reasons stated."

For these reasons we do not think usage, which here is used to mean subsequent development to the dates of the instruments, can or does change the intent of the grantors and grantees.

Lastly, much of this lawsuit, and of course the position of the appellants, is based on the case of Heinatz v. Allen (supra). In that case the Supreme Court, speaking through Judge Smedley, held that the limestone therein involved was not a part of the minerals, but went on to say:

"In our opinion substances such as sand, gravel and limestone are not minerals within the ordinary and natural meaning of the word unless they are rare and exceptional in character or possess a peculiar property giving them special value, as for example sand that is valuable for making glass and limestone of such quality that it may profitably be manufactured into cement. Such substances, when they are useful only for building and road-making purposes, are not regarded as minerals in the ordinary and generally accepted meaning of the word."

(Reference is here made to our previous discussion on the subject of usage, where the same type of limestone might be considered either a mineral or not, according to how it was being used). This statement, of course, is the substantial basis of appellants' position. We do not believe that this statement, coming as it does after and aside from the court's disposition of the case, is controlling in the matter before us. Appellees vigorously urge that such is obiter dicta. We are inclined to agree. However, be that as it may, we still adhere to our holding that, at the time of the instruments involved herein, the parties did not consider limestone and caliche as "other minerals", and did not intend to convey or reserve them as such; nor do we believe that appellants' interpretation and construction of Judge Smedley's statement can be extended as far as appellants would wish. It will be remembered that it is in evidence, through the witnesses, that the cement company has to import a certain amount of slag for its iron content; that the most important factors in the location of a plant are sales area, transportation, fuel, etc.; that the limestone and caliche used by the cement company off sections adjoining these here involved, and containing similar type of limestone and caliche, are not "rare or exceptional" in character; that they are using ordinary limestone similar to that which is found in abundance in the state; that a limestone that would be "rare and exceptional" would be limestone that had the exact chemical composition desired by one who manufactures Portland cement; that the witness knew of none such in the State of Texas. Another witness testified that he didn't know of any that could be called limestone that wasn't suitable; limestone that can be made into Portland cement is not rare and scarce, but actually

abundant. (These statements are taken largely from testimony of witnesses Otto P. Kroeger and Dr. William P. Mather). We do not believe that this statement by Justice Smedley was intended by him, or the court, to destroy or delineate the Texas concept of two estates—mineral and surface—in the absence of specific intent so to do when found in the instruments involved. The Heinatz case refers specifically to the Winsett and Psencik cases. We feel that the holding in the Heinatz case is that limestone is not a mineral, and the statement by Judge Smedley—which it is alleged by the appellees is not necessary to the disposition of the case and, therefore, obiter dicta—does not indicate an intention to make such limestone here involved a mineral. As the witness Kroeger stated (and it must be noted again that he is division superintendent of the cement company and has been in their employ since 1926), he knew of no limestone in this area or in the state that was rare and exceptional to the point that it had the exact composition desired by one who manufactures Portland cement.

We turn for a moment to other jurisdictions. The Supreme Court of North Dakota, in MacMaster v. Onstad, 86 N.W. 2d 36, after mentioning the Witherspoon and Psencik cases (supra), discusses the Heinatz case and then states, referring to the Heinatz case, as follows:

"This decision suggests that the class of minerals conveyed by a mineral deed is limited to those which are valuable, are not a part of the soil and may be mined without destroying the surface. To the same effect is Eldridge v. Edmondson, Tex.Civ.App., 252 S.W.2d 605."

In Cronkhite v. Falkenstein (supra), the Supreme Court of Oklahoma considered many authorities, including the Heinatz case, and said as follows:

"We conclude that by the use of the words in the mineral deed, 'oil, gas',

preceding other minerals, the latter term embraced only minerals of the same generic class as oil and gas, and did not include gypsum rock."

Other jurisdictions and courts have also spoken on the meaning and effect of the Heinatz case. In 36 Am.Jur. 306, section 35, we find the text stating:

"Limestone is not included in a grant or reservation of minerals and neither is sand gravel or clay."

■ We do not feel it expedient or necessary to go into any further extended discussion of the many cases and texts that have spoken on this matter. We simply hold that the quotation from the Heinatz case, and the Heinatz case itself, does not support the appellants' position here; but, on the contrary, the case itself supports the position of appellees. We believe that the many decisions and authorities and texts do not establish limestone as a mineral, and we hold that usage cannot accomplish this fact and thus change the terms of instruments executed many years ago. To hold otherwise would, as we have said previously, throw into hopeless confusion all mineral grants or reservations in at least a hundred Texas counties where limestone, according to the evidence, is found in abundance. Not only would this be true, but the precedent so created would lay the ground-work for controversy in all such instruments, as science and chemistry develop new uses and new processes. The amicus curiæ briefs emphasize this fact as having grave importance. Our holding is that contracts and instruments such as those here involved should be construed and given effect in terms of their environment at the time of execution. By environment we mean the ordinary terms, customs and usages then in effect as these are evidence of the intent of the parties. It must be remembered that the statement in the Heinatz case came many years after the instruments here involved had been executed and were in operation.

We therefore hold that the trial court reached the correct conclusion. Appellants' points are accordingly overruled and the judgment of the trial court affirmed.