Cowan v. Hardeman.

D. C. Cowan and others v. D. Hardeman and others.

The object and purpose of the proviso to the fourth section of the Act for the relief of James Erwin and others, passed June 3d, 1837, was simply to reserve to the Republic the islands, salt springs, gold and silver mines, copper, lead, and other minerals; and such reservation carries with it the right to enter upon lands located by individuals in which minerals or salines may be found, and to dig for and carry them away, and all other such incidents as are necessary to make the reservation available to the State.

But it was not the intention of that Act to prohibit the location and appropriation by individuals of lands in which minerals or salines may be found, nor is it to be construed to enact such a prohibition.

The construction now placed on the Act under consideration is the construction which all branches of the government have adopted ever since its enactment; and if it were held that the Act in question did prohibit the location of lands containing minerals, salines, &c., consequences would ensue not less embarrassing to the public than subversive of the titles under which the great mass of the lands hitherto granted by the government have been held.

The Act for the granting of land certificates to colonists of Fisher and Miller's colony, and the subsequent act for the issuance of patents on such certificates are not in violation of the ordinance attached to the constitution of 1845. While that ordinance prohibits legislative relief to the colony contractors, it cannot be held to prohibit the legislature from granting a part of the public domain to such colonists as had not become actual settlers within the colony, equally with any other citizens who might be made recipients of its bounty. The case of Causici v. La Coste, 20 Tex. R., 269, cited and approved.

Mr. Justice Moore intimates an opinion, as an individual member of the court, that the proviso to the fourth section of the Act of June 3d, 1837, for the relief of James Erwin and others, was limited to the grants made by that Act.

Mr. Chief Justice Wheeler is of opinion that the proviso in question was simply declaratory of the previous laws applicable to all grants, and was introduced into the Act out of abundant caution to preclude the inference that the laws reserving the islands, minerals and salines to the State, were repealed in favor of the beneficiaries of the Act. He is further of opinion that although a patent for lands containing minerals, &c., is not void and cannot be impeached by a mere intruder, yet the State may avoid it to any extent in the exercise of its reserved right to such minerals, &c.

APPEAL from Burnet. Tried below before the Hon. Nat. M. Burford.

This was an action of trespass to try title and for damages, brought by D. Hardeman, William P. Hardeman and William B. Coffee, against David C. Cowan, Gideon Cowan and James Alexander.

The land in controversy was a tract of six hundred and forty acres, to which the plaintiffs derived title by purchase from Peter Pauly, a colonist of Fisher's and Miller's colony. The land was granted to plaintiffs as assignees of Pauly, on the 18th of September, 1855, pending this litigation, and they set up their patent by an amended petition. In their original petition they alleged that there was a valuable saline upon the land, of which the defendants had wrongfully taken possession, and from which they were manufacturing salt, to the damage of the plaintiffs.

. The defendants demurred generally, and answerered with a general denial. The demurrer was overruled. At the trial the plaintiffs admitted that their vendor, Pauly, had never settled on the land in controversy. The defendant offered evidence to prove that the "saline" mentioned in the petition was a salt spring, but the court excluded the evidence. ·

The court charged that the plaintiff having read in evidence a patent for the land and the defendants failing to introduce any species of title, the jury were authorized to find for the plaintiff. There was verdict and judgment for the plaintiffs; a new trial refused, and defendants appealed.

Among the errors assigned was the overruling of the demurrer to the petition, it appearing on the face of the petition that there was a salt spring upon the land, which brought the land within the prohibition of the proviso to the 4th section of the Act of June 3d, 1837.   Other errors were assigned to the admission in evidence, against the objections of the defendants, of the certificate to Pauly and the patent thereon to the plaintiffs, his assignees, which, as contended, were void because Pauly never settled on the land, and because the laws authorizing the issuance of such certificate and patent were unconstitutional and void by reason of the ordinance attached to the constitution of 1846, concerning colonization contracts.

*A. J. Hamilton* for appellants—Insisted that the proviso already mentioned was "an unqualified reservation and would defeat the title or claim of the appellees even if the patent had issued to them—especially so, if they had knowledge of its character at the time of its issuance.   It would be, in such case, a patent obtained by the grantees in fraud of the law, contrary to its express provision, and therefore void. (7 Tex. R., 76; 9 Cranch. R., 99; 6 Wheaton R., 577; 2 How. R., 284; 10 Bacon's Abridg., 374; 7 How. R., 89.)

*J. A. & R. Green, and Hancock & West,* for appellees.

MOORE, J.   The main question for our decision in this case, depends upon the construction that must be placed upon the proviso in the fourth section of the act for the relief of James Erwin and others, passed June 3d, 1837, which reads as follows : "Provided, That no lands granted by this government shall be located on salt springs, gold or silver mines, copper or lead, or other minerals, or any island of the Republic."

By this provision of the statute it is contended, as we understand appellants' counsel, that the islands and all lands containing minerals, were separated from the mass of the public domain, and were thereby withdrawn from individual appropriation by the location thereon of the land script issued by virtue of said act of June the

3d, 1837, or by any other character of certificate or claim to land. And that, it appearing from the petition filed by the appellees, who were plaintiffs in the court below, that there was "*a valuable saline*" upon the six hundred and forty acres of land, for which suit was brought; the patent therefor, which was granted to appellees as the assignees of a certificate issued to a colonist of Fisher and Miller's colony, was absolutely null and void.

This proposition, if correct, must lead to startling and unexpected consequences, not less embarrassing to the public than subversive of the titles under which seven-tenths of the lands granted by the government have been hitherto held. If all the lands in the State in which any minerals can be found were withdrawn from location, how much of the public domain was left subject to appropriation? A very superficial observation or knowledge of the country must convince us that the amount left subject to location would fall far short of satisfying the certificates and scrip heretofore issued by the State. Whose title would be secure? The homestead of one of the heroes of San Jacinto or Bexar, the seat of honest toil, and held by patent since the first organization of the land office, without the slightest suspicion as to the validity of his title, or that the land was of the least value except for its agricultural products, may to-morrow be found to have beneath its surface a strata of coal or a mine of gold, and his title must consequently be held to be absolutely null and void; having been issued for land which the surveyor had no authority to survey, or the Commissioner of the General Land Office to patent. If this is the true construction of the statute, the great mineral wealth of the State, of which we have so often justly boasted, and to which we have confidently looked as a source of future wealth and prosperity, would prove to be the means of untold evil, and no greater scourge could befall the State than a geological survey for the development of its mineral resources.

But if the patents are void because minerals are to be found within the lands granted, the patentee as well as the State may take advantage of it; and any one, who can show that there are any minerals within the land described in his patent, may demand his certificate from the Commissioner of the Land Office and have

it again located, with the utmost confidence that he will be able to vacate the second patent for the same reason, whenever he may feel inclined to do so.

But is this the correct construction of this statute? We cannot agree that it is. If the law were clear, explicit and unambiguous in its terms, and susceptible of but the one interpretation, as appellants' counsel seem to regard it, its consequences, if evil, could only be avoided by legislative interposition, and not by judicial action. But that is not the case; the language of the proviso is contradictory in itself. It declares that "no lands *granted*" "shall be located, &c;" but if the land has been "granted," the location has already been consummated. And hence, if we look to the ordinary and usual import of the words and the grammatical construction of the sentence, we are left in doubt as to the true intent and meaning of the legislature. To give it the construction contended for by appellant's counsel, the proviso should be modified so as to read, "that no certificates or other claim to land granted," &c., "shall be located on salt springs," &c. But are we not as fully authorized, by the grammatical construction of the sentence and the object and spirit of it, to say nothing of the uniform and practical construction that has, from the date of its enactment to the present time, been placed upon it by all the departments of the government, to construe it as declaring, that no lands granted shall vest title to any salt spring, gold or silver mines? &c.

The words of the statute not being, as it is quaintly but forcibly expressed by Lord Coke, "plain without any scruple, and absolute without any saving," it becomes necessary, to ascertain its true intent and meaning, that we should resort to the well established rules of statutory construction as our guide; and these require that we should seek to ascertain and give effect to the *thought which the legislature intended to express.* (Newell v. The People, 3 Seld., 97.) What object had the legislature in view by the enactment of the proviso in question? It was not, surely, to prohibit the surveying and patenting of any part of the public domain until the impossible and never attempted task should be performed by the legislature of ascertaining and designating the mineral lands. Neither could they have intended to leave it as a

matter of doubt and uncertainty with the surveyors and commissioner what land they should survey and patent; nor after a patent had been granted, that no one should be able to say that it might not at some future day be shewn to be void by the discovery of a mine or mineral there hidden within the bowels of the earth.

The object and purpose of the legislature was simply to reserve to the Republic the islands and the salt springs, gold and silver mines, copper and lead and other minerals, as corporeal hereditaments out of the public domain; and thus, while the mineral resources of the country that were then known to exist or that might afterwards be developed were thereby secured to the government, no embarrassment was placed in the way of the citizen in acquiring the fee in the quantum of land to which his certificate or scrip entitled him. It is a well established doctrine from the earliest days of the common law, that the right to the minerals thus reserved, carries with it the right to enter, dig and carry them away, and all other such incidents thereto as are necessary to be used for getting and enjoying them. (The Queen and Earl of Northumberland, Plow. 310, 336; Earl of Cardigan v. Armitage, 4 Barn. & Cres., 197.) And this is also the civil law. (Rockwell's Spanish and Mexican Law, 49, 53, 83.)

Nor does the reservation of its minerals and corporeal hereditaments out of granted lands, create any unusual or novel estate. It is a doctrine as old as the common law that all royal mines, that is to say, those of gold or silver, throughout the kingdom, belonged to the sovereign; and it is said, that though the King grant lands in which mines are, and all mines in them, yet royal mines will not pass by so general a description. (Plow., 336.) And we think it is evident that the legislature intended to do nothing more in this statute than to secure by an express reservation the same right to all minerals, when it granted land, that was by the common law impliedly reserved to the King as to royal mines. Nor can it be urged that this construction militates against the express words of the law, which forbids the location of land, and that thereby we must understand that something more was intended to have been reserved than the corporeal hereditament of the minerals; for it must be remembered that this character of

hereditaments are real estate. It is said in Rockwell's Spanish and Mexican Law, 580, "That a property may be acquired in mines which will be quite independent of the property in the lands in which they are situated. In this condition, the minerals, of whatever character they may be, will, of course, still form parts of the land itself, and will constitute land in strictly legal acceptation."

It is also insisted that the patent to appellees is void because the statute under which it was issued was unconstitutional, having been passed in violation of the true intent and meaning of the ordinance, with reference to colony contracts, attached to the constitution. The patent was granted by virtue of a certificate issued to a colonist of Fisher and Miller's colony. But it is said that the law granting the certificate was a law for the relief of the colonist; and that the ordinance forbid the granting of relief to either the contractors or the colonists unless the latter were actual settlers within the colony. We do not think this position can be sustained. While the ordinance expressly declares that no relief shall be granted to the contractors, it provides that all actual settlers shall be entitled to their quantity of land. This certainly could not, by implication, be held to prohibit the legislature from granting a part of the public domain to such colonists as had not become actually settlers within the colony, equally with any other citizens who might be made the recipients of its bounty. But this point has been clearly, and we think correctly, settled by the case of Causici v. La Coste, 20 Tex., 263; and it is therefore unnecessary to dwell further upon it.

We will say in conclusion, that although we have discussed the question presented by appellants' counsel upon the hypothesis assumed by them, that the proviso to the 4th section of the act of June the 3d, 1837, was intended by the legislature as a rule of universal application to grants by the State, we, as an individual member of the court, think, however, it may well be questioned if its true construction does not limit it to the grants made by the law in which it is contained.

There is no error in the judgment, and it is therefore affirmed.

WHEELER, C. J. In the case of Delesdenier v. The State, (7

Tex. R., 102–3,) the proviso of the act of January 3d, 1837, (Hart. Dig., art. 1,810,) which has been brought into discussion in this case, was considered by the court as the declaration of a general principle applicable to all grants by the State. As such I think it was intended by the legislature; not as the adoption of a new principle in the law of the State, but as declaratory of the existing law. As the object of the act was to discharge a debt contracted by the government, by the sale of scrip, which might be supposed to possess peculiar merits, and to operate, in so far as the holders of this scrip were concerned, a repeal of the laws creating reservations of islands, salt springs, &c., the proviso was introduced, out of abundant caution, to guard against the implication that such repeal was intended. It was intended as declaratory of the existing law in its application especially to the scrip for which they were providing.

The legislation of the Congress of the Republic affords other evidences of the solicitude of the legislature to guard the interest of the State in her islands, salt springs and minerals. There is a similar instance of the insertion of a provision reserving the islands from private appropriation, in the Joint Resolution of the 10th of December, 1836, (Hart. Dig., art. 1779,) authorizing the President to negotiate a loan, and providing for the issuing of land scrip for the purpose. And in the act of the 20th of January, 1840, (Hart. Dig., art. 127,) "to adopt the common law," and "repeal certain Mexican laws," &c., the repealing section expressly excepts from its operation "such laws as relate to the reservation of islands, and also of salt lakes, licks and salt springs, mines and minerals of every description;" manifesting a settled policy and purpose, on the part of the legislature, to protect the interest of the State in the enumerated objects, and to guard against their appropriation to the purposes of private speculation.

We hold that the patent is not absolutely and necessarily void because there is found to be a salt spring or minerals upon the land embraced within the grant. And not being void, it cannot be impeached and avoided by a mere intruder. In so far as concerns the use, it may, however, be avoided in part or in whole by the State in the exercise of its reserved right in the salt spring or

minerals embraced within it.   The State must have the easement of going upon the land for this purpose; and if to the full enjoyment of the right of the State it should become necessary to use the whole of the land, timber and water upon the tract, the right of the State to an easement to that extent cannot, I apprehend, be questioned.

Judgment affirmed.