**SUN OIL COMPANY, Petitioner,**

v.

**Earnest WHITAKER, Respondent.**

No. B–2300.

Supreme Court of Texas.

June 28, 1972.

Rehearing Denied July 26, 1972.

Stubbeman, McRae, Sealy, Laughlin &
Browder, Tom Sealy and W. B. Browder,

Midland, E. M. Cage, Dallas, for petitioner.

Nelson, McCleskey & Harriger, George W. McCleskey, Lubbock, Earl R. Allison, Morgan Mill, Dwight R. Mann, Dallas, for respondent.

## ON REHEARING

McGEE, Justice.

Our judgment of October 27, 1971 is set aside and our prior opinion is withdrawn and the following is substituted therefor.

This case was before us at an earlier time in an appeal from a judgment denying a temporary injunction. 424 S.W.2d 216. We affirmed the courts below. Our decision in the temporary injunction appeal turned on the fact that issue had been joined by the parties on a contention by the Whitakers and an intervenor, High Plains Underwater Conservation District No. 1, that Sun's proposed use of water for waterflood purposes constituted statutory waste, but by agreement this defense, and no evidence thereunder, was submitted to the trial court for a ruling. In that appeal we held (page 219): "The agreement that issue would not be joined and arguments would not be made concerning the issue of statutory waste raised by Whitaker's answer and the water district's plea in intervention completely destroyed Sun's ability to show its probable right on final trial to a permanent injunction." We did not reach the merits of the case; our prior judgment in no way established the law in this case, nor in fact did it purport to do so.

After our prior decision, the issue of waste was later eliminated by withdrawal of all pleadings raising it, the Water District withdrew from the case, and this issue is not now before us. A part of the factual statement set out below has been lifted from our former opinion.

Earnest Whitaker is the owner of the surface estate and Sun Oil Company is the owner of a mineral leasehold estate in a 267-acre tract of land in Hockley County. Sun acquired its lease on the property on April 5, 1946, from L. D. Gann and his wife, then the owners of the fee title subject to an outstanding non-participating one-sixteenth free royalty in the west one-half of the tract. The surface estate was conveyed by Gann and his wife to Whitaker on January 2, 1948. The conveyance to Whitaker was subject to Sun's lease, and the deed expressly excepted and reserved all minerals that might be produced from the land to the Ganns, their heirs and assigns.

Sun's lease has been kept alive beyond the primary term of five years by production from eight oil wells which are producing from the San Andres formation. When production from its oil wells decreased because of diminishing pressure in the San Andres formation, Sun obtained permission from the Railroad Commission to inject fresh water into the San Andres in furtherance of a pressure maintenance program. Whitaker and his son-in-law, Doyle Henderson, are using water from the Ogallala formation for cultivating the land as an irrigated farm.

Following our decision in the appeal from the temporary injunction judgment, the parties proceeded to trial of the case on its merits. Sun sought a permanent injunction enjoining the defendants from interfering with its production of not more than 100,000 gallons of fresh water per day, through an existing supply well, from the Ogallala formation underlying Whitaker's tract of land for use in producing the oil. By cross-action Whitaker sought to enjoin Sun from producing and using the fresh water to produce the oil. Whitaker also sought to recover actual damages for the water theretofore used and for crops destroyed, and, as well, exemplary damages. The case was tried to a jury and based upon the jury's verdict, judgment was rendered that Sun take nothing by its suit, that Whitaker recover the sum of $12,598.03 for actual and exemplary

damages, and that Sun be permanently enjoined from producing and using the fresh water for its waterflood program. The court of civil appeals affirmed. 457 S.W.2d 96. Judgments of the courts below are reversed and judgment is rendered that the permanent injunction prayed for by Sun is granted, and all relief sought by Whitaker is denied except Whitaker is to recover the sum of $431 which has been tendered into court by Sun.

Sun's lease grants and leases the 267-acre tract to Sun "for the purposes of investigating, exploring, prospecting, drilling and mining for and producing oil, gas and all other minerals. . . ." The lease also provides: *"Lessee shall have free use of* oil, gas, coal, wood and *water from said land except water from Lessor's wells for all* operations hereunder. . . ."[1]

The evidence shows that the water produced from Sun's well is being produced from the only available source of water on the land and that such water in being used exclusively for the benefit of the leased premises, the so-called Gann-Whitaker tract. Efforts to use available salt water, other than that produced with the oil, have failed. The waterflood operation will result in the production of additional oil, valued at $3,200,000. The evidence further shows that the Sun water supply well is equipped so that it cannot produce in excess of 100,000 gallons of water per day. Sun's water supply well is located 3,138 feet from Whitaker's water supply well on this lease.

The defendants stipulated at this trial that (1) "the waterflood process is a reasonable and proper operation for the production of oil from the San Andres Reservoir under the L. D. Gann tract"; (2) the use of "Ogallala water as the extraneous or make-up water for injection into the San Andres Reservoir under the L. D. Gann tract in conducting secondary recovery of oil by a waterflood process" is a reasonable and proper operation; and (3) "the location of the injection wells and the rates of water injection" as conducted by Sun "constitute reasonable and proper operations for the production of oil." There is, therefore, no fact issue in the case concerning the stipulated matters.

Sun relies on two legal theories upon which it bases its claim to use the Ogallala water, from its own water wells, under the Gann lease to waterflood wells on this lease. (1) As owner of the dominant estate by virtue of its oil and gas lease it has the implied right as a mineral lessee to use such part of the surface and so much thereof as may be necessary to effectuate the purposes of the lease, and (2) it possesses an expressed contractual right to *"free use of . . . water from said land except water from Lessor's wells for all operations* hereunder. . . ."

In affirming the trial court's judgment, the Court of Civil Appeals dealt with the case as though it involved only the second of Sun's theories; the Court held that the meaning of the quoted language authorizing free use of water from the Whitaker land was doubtful and ambiguous when applied to the subject matter of the contract, and that evidence introduced on the trial supported jury findings that the parties to the lease did not contemplate or intend that large quantities of water would be used for waterflood purposes. We need not decide whether the opinion of the Court of Civil Appeals is sound inasmuch as we are satisfied that Sun has the implied right to free use of so much of the water in question as may be reasonably necessary to produce the oil from its oil wells.

■ The oil and gas lessee's estate is the dominant estate and the lessee has an implied grant, absent an express provision for payment, of free use of such part and so much of the premises as is reasonably necessary to effectuate the purposes of the lease, having due regard for the rights of the owner of the surface estate. Humble

1. Emphasis ours throughout unless otherwise indicated.

Oil & Refining Co. v. Williams, 420 S.W. 2d 133 (Tex.1967); Warren Petroleum Corp. v. Martin, 153 Tex. 465, 271 S.W.2d 410 (1954); Warren Petroleum Corp. v. Monzingo, 157 Tex. 479, 304 S.W.2d 362 (1957); Brown v. Lundell, 162 Tex. 84, 344 S.W.2d 863 (1961). The rights implied from the grant are implied by law in all conveyances of the mineral estate and, absent an express limitation thereon, are not to be altered by evidence that the parties to a particular instrument of conveyance did not intend the legal consequences of the grant.

■ The implied grant of reasonable use extends to and includes the right to use water from the leased premises in such amount as may be reasonably necessary to carry out the lessee's operations under the lease.

"The grant of the oil carried with it a grant of the way, surface, soil, water, gas and the like essential to the enjoyment of the actual grant of the oil. Guffey v. Stroud, 16 S.W.2d 527, 528 (Comm. of App. 1929).

". . . we believe that the reservation in the deeds by implication retained to the Southwest the right to use the amount of water from the land reasonably necessary to enable it to develop the mineral rights; this it sold and transferred to Magnolia. . . . Magnolia had the right to use the amount of water reasonably necessary for the development and enjoyment of the oil discovered on its lease. Stradley v. Magnolia Petroleum Company, 155 S.W.2d 649, 652 (Tex.Civ.App.1941), writ ref."

In Brown v. Lundell, supra, this Court, though holding the lessee liable for negligence reaffirmed the above quoted rule from Guffey v. Stroud.

■ Water, unsevered expressly by conveyance or reservation, has been held to be a part of the surface estate. Fleming Foundation v. Texaco, Inc., 337 S.W.2d 846 (Tex.Civ.App.1960, writ ref'd, n. r. e.).

However, that decision expressly recognized the right of the oil and gas lessee to drill water wells on said land and to use water from such wells to the extent reasonably necessary for the development and production of such minerals. The added language in the instant case that Sun was to have "free use of . . . water from said land except water from Lessor's wells for all operations" under the lease added no limitation on the implied grant except that such water should not be taken from lessor's wells.

■ Courts have held waterflood projects to be reasonably necessary operations under oil and gas leases. Carroll v. Roger Lacy, Inc., 402 S.W.2d 307 (Tex. Civ.App.1966, writ ref'd, n. r. e.); Gulf Oil Co. v. Walton, 317 S.W.2d 260 (Tex. Civ.App.1958, no writ hist.); Tidewater Oil Co. v. Penix, 223 F.Supp. 215 (U.S.D. C.Okl.1963); Utilities Production Corp. v. Carter Oil Co., 2 F.Supp. 81 (U.S.D.C. Okl.1933). As stated in Holt v. Southwest Antioch Sand Unit, 292 P.2d 998 (Okl. 1956) at page 1000:

"It would be difficult to conceive of a use of the water more essentially a part of the operation of mining and removing the petroleum minerals from under said land."

In Carter Oil Co. v. Dees, 340 Ill.App. 449, 92 N.E.2d 519 (1950), though the lease was silent as to a gas repressuring method of secondary recovery, the Court held that the lessee in using reasonable diligence under the lease could adopt such method. Sun has an implied right to waterflood because the waterflood operation is reasonably necessary to carry out the purposes of the lease. The reasonableness of Sun's waterflood operation stands uncontradicted in this record. Its use of Ogallala water for injection was approved by the Railroad Commission. The stipulations are conclusive under this record that the use of Ogallala water was reasonably necessary to *effectuate the purposes of the lease.*

The jury's answers to Special Issues Nos. 3, 4 and 7 were that: ". . . the use of fresh water by Sun Oil Company for secondary recovery purposes from the well which it has drilled on said tract will materially affect the supply which the surface owner could produce by wells"; ". . . it is not reasonably necessary for Sun Oil Company to use water from the Ogallala formation underlying the Whitaker farm to waterflood the L. D. Gann lease"; and ". . . the proposed use of fresh water by Sun Oil Company for waterflood purposes will substantially devalue the farm owned by the Defendant Whitaker." Whitaker argues that these jury findings support the judgment of the trial court in that they support a conclusion that it is not reasonably necessary for Sun to use the fresh water underlying his tract to waterflood the lease.

We have concluded that there is no evidence to support the jury's finding that it is not "reasonably necessary" for Sun to use the water underlying the Whitaker farm for its waterflood project. As pointed out above, efforts to use available salt water for the waterflood project have failed, and there is no other source of usable water on the leased Whitaker tract which is available to Sun. To hold that Sun can be required to purchase water from other sources or owners of other tracts in the area, would be in derogation of the dominant estate.

Our holding in Getty Oil Co. v. Jones, 470 S.W.2d 618 (Tex.1971), is not applicable under the facts of this case. It is limited to situations in which there are reasonable alternative methods that may be employed by the lessee *on the leased premises* to accomplish the purposes of this lease.

Judgments of the courts below are reversed and judgment is hereby rendered granting Sun's application for permanent injunction enjoining Whitaker from interfering with its production of not more than 100,000 gallons of fresh water per day, through its supply well, from the Ogallala formation underlying the Whitaker-Gann lease tract for use in producing oil and denying all relief sought by Whitaker except that Whitaker recover the sum of $431 which had been tendered into the registry of the court.

Dissenting opinion by DANIEL, J., in which GREENHILL, STEAKLEY and DENTON, JJ., join.

DANIEL, Justice (dissenting).

I respectfully dissent. I adhere to that portion of the majority opinion which restates the general rule that, unless otherwise provided by contractual provisions, an oil and gas lessee has an implied right or easement to make such use of underground water as may be reasonably necessary for ordinary and customary primary drilling and producing operations. However, I completely disagree with the majority's extension of this "implied easement" doctrine so as to permit Sun also to take, consume and deplete an enormously greater quantity of water for a vastly different repressuring and secondary recovery process in the face of jury findings that the parties to the lease did not contemplate or mutually intend such use; that it would materially affect the supply which the surface owner could produce by wells for irrigation of the surface; that such use was not reasonably necessary; and that it will substantially reduce the value of the surface for agricultural purposes.

The majority fails to consider the vital distinction between the occupancy and use of the surface, including water, for ordinary drilling and production operations which do not substantially consume, diminish or destroy the surface estate and the relatively new, extraordinary and far more extensive taking of fresh water for injection into oil sands in a manner which substantially destroys and diminishes the surface estate. Water flooding is not an ordinary primary production method; it is an extraordinary and extraneous medium

usually employed after ordinary primary operations have terminated.[1]

Underground water is part of the surface estate, and unless severed by reservation or conveyance, it belongs to the owner of the surface.[2] Whitaker, purchaser of the surface estate in 1948, had drilled wells to the Ogallala formation, a closed and isolated underground fresh water reservoir, encountered at a depth of approximately 200 feet, and this is his only source of water for domestic and irrigation purposes. Whitaker was using the water for agricultural irrigation for 5 years before Sun sought to use the same source of water for water flooding its oil sand.

Sun, which purchased an oil and gas lease from Whitaker's grantor in 1946, completed eight producing oil wells on the Whitaker 267 acres in the San Andres sand. The record reflects no objection to Sun's use of water for the ordinary and customary primary drilling and producing operations, which were conducted during the initial 18 years of operations under the lease at the surface well sites and through the well bores by open flow and later by pumping. In 1965, when the primary production from these wells declined because of pressure attrition, Sun sought to increase the underground pressure by water flooding the San Andres sand through two injection wells to be drilled on the Whitak-

er tract. This much of the program was approved by an order of the Railroad Commission, but the order did not undertake to state or approve the source of the water which was to be injected. Although water from other sources was admittedly available by purchase, Sun proceeded to drill a 200 foot well into the Ogallala fresh water sand on Whitaker's land, from which it pumps water at the rate of not to exceed 100,000 gallons per day without the consent of or compensation to Whitaker. The fresh water is injected by pressure pumps through the two injection wells into the San Andres sand at an average depth of 4770 feet, where it mixes with the salt water and increases the reservoir pressure. According to Sun, the use of this "extraneous medium" will cause the wells on the Whitaker tract to yield an additional one million barrels of oil worth about $3,000,000. For this purpose, Sun proposes to consume a total of 4,200,000 barrels of Whitaker's Ogallala water, which will shorten the life of Whitaker's water supply by at least eight years. Whitaker owns only the surface estate and therefore receives no royalty from the oil production.

Sun contends that, regardless of the effect upon the surface estate, it has the implied and express right under its lease to take and consume this portion of the surface estate without any compensation to

1. "Water flooding has been defined as the deliberate, controlled injection of water into an oil-producing stratum for the purpose of increasing the percentage and rate of recovery of oil from the stratum . . . Its function is to recover oil which would not be otherwise recoverable by primary production methods. It is what is known as a secondary recovery method, and by this is meant a method which obtains recovery through increase in reservoir energy, by the injection of liquids or gases into the reservoir after the original reservoir energy has been dissipated, and usually, but not always, after the primary recovery period has been terminated. The use of water flooding to increase production is not a new process, although it is comparatively recent in Texas and other parts of the Southwest." Brown and Myers, Some

Legal Aspects of Water Flooding, 24 Tex.L.Rev. 456 (1946). In Dunn v. Republic Natural Gas Co., 124 F.2d 128 (5th Cir., 1942), Judge Hutchinson, in holding at p. 131 that the lessee must pay for gas used in repressuring an oil sand, said "these were not ordinary oil producing operations . . . These are extraordinary operations. . . ."

2. See Corpus Christi v. Pleasanton, 154 Tex. 289, 276 S.W.2d 798 (1955); Texas Co. v. Burkett, 117 Tex. 16, 296 S.W. 273 (1927); Tex.Water Code § 52.002, V.T. C.A. See also Fleming Foundation v. Texaco, Inc., 337 S.W.2d 846 (Tex.Civ. App., 1960, writ ref. n. r. e.) in which it was held that water is not a "mineral" within the phrase "all the oil, gas and other minerals" in an oil and gas lease.

the surface owner, and that it is entitled to an injunction restraining Whitaker from interfering with its taking of water from the Ogallala formation to increase its production by this secondary recovery process.

### Contract Provisions

Sun correctly argues that, so long as no violation of law is involved, the parties to its lease were free to contract as they pleased; its lessor could have granted Sun the right to consume and deplete the entire Ogallala water sand and the entire surface estate of the Gann-Whitaker tract for secondary water flooding and repressuring if the lessor had so elected to contract or convey. On the other hand, any such right to destroy or substantially diminish and consume the surface estate should be clearly spelled out in the contract and not be implied from general provisions relating to substantially non-consuming and non-destructive occupancy and uses of the surface. In another context we said as much in Acker v. Guinn, 464 S.W.2d 348 (Tex. 1971) as follows:

> "The parties to a mineral lease or deed usually think of the mineral estate as including valuable substances that are removed from the ground by means of wells or mine shafts. This estate is dominant, of course, and its owner is entitled to make reasonable use of the surface for the production of his minerals. It is not ordinarily contemplated, however, that the utility of the surface for agricultural or grazing purposes will be destroyed or substantially impaired. Unless the contrary intention is affirmatively and fairly expressed, therefore, a grant or reservation of 'minerals' or 'mineral rights' should not be construed to include a substance that must be removed by methods that will, in effect, consume or deplete the surface estate. See Clark, Uranium Problems, 18 Tex. B.J. 505." 464 S.W.2d at 352.

The fact that commercial production of limestone would destroy the surface for agricultural and grazing purposes was per-suasive in this Court's decision that a devise of "the mineral rights" would not be construed to include limestone, "although technically a mineral." Heinatz v. Allen, 147 Tex. 512, 217 S.W.2d 994 (1949). See also Atwood v. Rodman, 355 S.W.2d 206 (Tex.Civ.App.1962, writ ref. n. r. e.) and other cases cited in Acker v. Guinn, supra. By analogy, unless the contrary intention is affirmatively and fairly expressed, a mineral lease should not be construed by implication to include the right to take and destroy enormous amounts of fresh water (over and above that customarily used in ordinary primary drilling and production operations) for secondary recovery processes that will, in effect, consume or substantially deplete the surface estate. No implication should be indulged that the lessor intended the dominant use and occupancy easement to include the right to destroy or substantially diminish the utility of the surface for agriculture purposes, all of which are dependent upon irrigation wells producing from the Ogallala sand.

By the same token, the term "all operations hereunder" in the "free wood and water" clause, being undefined and having no fixed meaning, while technically broad enough to cover water flooding, should not be interpreted as covering such secondary recovery processes which would consume or substantially diminish the fresh water supply and hence the utility of the surface for agricultural purposes. This is especially true when all specific references to operations in the lease refer only to primary type drilling and production operations and when there are specific provisions in the lease for the protection of the use of the surface for agricultural purposes, such as the prohibition of the use of water from lessor's wells and the provision that lessee "will bury pipe lines below ordinary plow depth and pay damage caused by Lessee's operations to growing crops."

In this connection, it should be mentioned that the lease on the Whitaker tract was written on a form furnished by the lessee which had the name "SUN OIL

COMPANY" printed thereon as Lessee. It has been held that the "language of an oil and gas lease is generally regarded as that of the lessee" and "it appears to be the settled rule in this state that of two or more equally reasonable constructions of which the language of an oil and gas lease is susceptible the one more favorable to the lessor will be allowed to prevail." Zeppa v. Houston Oil Co. of Texas, 113 S.W.2d 612 (Tex.Civ.App.1938, writ ref.).

If Sun had contemplated or intended for its lease to cover free use of water for secondary repressuring of the subsurface oil sands, it could have made this known to its lessor and so contracted in specific language, by use of a provision which the record shows to have been placed in Sun leases on other tracts as early as 1947, in the following words:

"Lessee shall have free use of oil, gas, coal and water from said land except water from Lessor's wells for all operations hereunder, *including repressuring, pressure maintenance, cycling, and secondary recovery operations . . .*" [3]

In my opinion, the trial court, based upon the jury findings, and the Court of Civil Appeals have correctly decided against Sun's claim to an express grant of the right to take the fresh water under Whitaker's land for repressuring the San Andres sand by water flooding. Since the majority states that "We need not decide whether the opinion of the Court of Civil Appeals is sound" in as much as it is satisfied that Sun has "the implied right to free use of so much of the water in question as may be reasonably necessary to produce the oil from its oil wells," I will shorten this phase of my dissent by simply saying that I agree that the opinion of the Court of Civil Appeals is sound, except as to its approval of exemplary damages. Both the present opinion of the Eastland Court (457 S.W.2d 96) and the earlier opinion of the

Amarillo Court of Civil Appeals, 412 S.W. 2d 680 (Tex.Civ.App.1967, affirmed on other grounds, 424 S.W.2d 216, 1968), denying Sun's application for a temporary injunction, are well reasoned. I refer to them for details on the evidence and law relating to the ambiguity which results when an attempt is made to apply this otherwise unambiguous lease contract to the subject matter of this suit; the effect of absence of any specific provision in the lease relating to secondary recovery by water flooding; the specific provisions for protection of lessor's wells and growing crops; that water flooding was not practiced in the west Texas area when the lease was signed in 1946; and other evidence which supports the jury findings to the effect that Sun's extensive use of fresh water for secondary recovery by water flooding was not mutually contemplated or intended by the parties to the 1946 lease.

The Kentucky case of Wiser Oil Company v. Conley, 346 S.W.2d 718 (Ky.1960) presented a similar fact situation, wherein the surface owner sought an injunction against the oil and gas lessee to prevent secondary recovery by water flooding and for damages to a coal seam retained by the landowner. The court approved the trial court's findings of fact to the effect that such operation would cause substantial injury to the coal and to the surface which was regularly farmed; and that water flooding was not in use in Kentucky at the time of the execution of the lease. The court held:

"There is a sound basis for the rule that a deed or lease of minerals carries with it the right to use as much of the surface, or other property, as may be reasonably necessary to exploit the minerals. We also are aware of the well-known concept that where the injury done to the property was of an anticipatory character, such a result would con-

3. Emphasis supplied. The "wood and water" clause in the lease on the Whitaker tract was identical except for

the addition of "wood" and the omission of the underlined phrase.

stitute damnum · absque injuria. But where, as here, there is no express release of damages and a new method of withdrawing oil is employed, which was not in the minds of the parties at the time the lease was executed and which will destroy or substantially damage the landowner's remaining estates, principles of justice and humanity would require that reasonable compensation be paid the landowner for the devastation wrought." 346 S.W.2d at 721.

### Implied Easement

For the same reasons stated above with reference to the alleged express grant, it should be held that Sun is not entitled under the general grant of the minerals to an implied right to take, consume, and deplete the fresh water sand on the Whitaker land without compensation to Whitaker. The holding of an implied grant, irrespective of the existence or terms of an express grant, is far reaching, regressive, and without direct precedent since the days when all minerals were royal patrimonies owned by the sovereign crown or state. Perhaps a bit of history will demonstrate where we have been and the direction in which the law has traveled on the subject of dominant estates held by owners or lessees of severed minerals.

The rule in Texas that a severed mineral estate is dominant and the surface estate servient had its genesis in the Spanish law under which the King held separate ownership of all minerals under both private and public lands.[4] As with all royal patrimonies, the sovereign's separate and severed mineral ownership on private lands rendered the surface estate servient and sub-

ject to any use the King might find necessary to mine for and produce the minerals on or beneath the lands of his subjects. The Republic of Mexico and subsequently the Republic of Texas retained the law of sovereign ownership of mines and minerals under all lands.[5] When the Republic of Texas adopted the common law in 1840, it specifically provided that it did not apply to "such laws as relate to the reservation of . . . salt springs, mines and minerals of every description made by the general and State governments," and this was carried forward as the law of the new State when Texas became a member of the Union.[6]

It was during this period of State ownership of all minerals that the Supreme Court of Texas held in Cowan v. Hardeman, 26 Tex. 217 (1862), a dispute between individuals over Cowan's mining and manufacture of salt from a spring located on land patented to Hardeman, that the State owned the salt and warned by dictum that the State's "right to the minerals thus reserved carries with it the right to enter, dig and carry them away, and all other incidents thereto as are necessary to be used for getting and enjoying them." A concurring judge agreed that Hardeman's patent to the surface was valid but said: "In so far as concerns the use . . . it may be avoided in part or in whole by the state in the exercise of its reserved right in the salt spring or minerals embraced within it. The state must have the easement of going upon the land for this purpose; and if to the full enjoyment of the right of the state it should become necessary to use the whole of the land, timber and water upon the tract, the right of the state to an ease-

4. Cowan v. Hardeman, 26 Tex. 217 (1862); State v. Parker, 61 Tex. 265 (1844); Law V, Title 15 of Partida 2, Las Siete Partides, Scott's Translation (1931) 369; Mexican Mining Ordinances of 1783, Chapter V, Rockwell's Spanish and Mexican Law, p. 49. The same general doctrine applied at common law under crown ownership of all minerals. Cowan v. Hardeman, supra.

5. For an historic and annotated account of this adoption of the Spanish and Mexican law, see Walace Hawkins, El Sal del Rey, 11–15, 23–28 (Texas State Historical Association, 1947).

6. Laws, Republic of Texas, 7th Cong., 1840, 3–4; 2 Gammel's Laws of Texas 177; Articles VII, Sec. 20 and XIII, Sec. 2, Constitution of 1845; 2 Gammel's Laws of Texas 1293–94, 1299.

ment to that extent cannot, I apprehend, be questioned." This was but a restatement of the sovereign rights which were understood to accompany the previous "dominio radical" of the King in severed minerals.

By the Constitution of 1866, the State released and relinquished all mines and minerals to the owners of the soil.[7] Subsequent court decisions, while recognizing the dominant easement of private owners or lessees of severed minerals, have gradually required more regard for the servient surface estate than was previously required under the "dominio radical" (ultimate or basic ownership) of the King or the sovereign state.[8] None has followed *Cowan,* supra, by holding that the dominant mineral easement may be used to completely void, consume or destroy the surface estate. In recent years the implied right to surface occupancy and uses by mineral lessees have been limited to those uses which are "reasonably necessary" to effectuate the purposes of the lease, having "due regard to the rights of the owner of the surface [estate]." Humble Oil & Refining Co. v. Williams, 420 S.W.2d 133 (Tex.1967); Brown v. Lundell, 162 Tex. 84, 344 S.W.2d 863 (1961). A definite trend toward conciliation of conflicts and accommodation of both estates is evident in our court decisions and in the conduct between the lessees and surface owners. Getty Oil Company v. Jones, 470 S.W.2d 618 (Tex.1971); Acker v. Guinn, supra; Brown v. Lundell, supra; Sun Oil Company v. Whitaker, 412 S.W.2d 680 (Tex.Civ.App.1967), supra. In *Getty* it was said:

"Although the earlier cases were generally limited to a consideration of the lateral surface, we held in Brown v. Lundell, 162 Tex. 84, 344 S.W.2d 863 (1961), that the rule of liability of the mineral lessee for negligently and unnecessarily damaging the surface estate includes the subsurface. This decision implicitly recognized that there are vertical as well as lateral boundaries to the use of the surface estate by the oil and gas lessee. We now hold explicitly that the reasonably necessary limitation extends to the superadjacent airspace as well as to the lateral surface and subsurface of the land." 470 S.W.2d p. 621.

This Court has led the way in working out accommodations which preserve unto the severed mineral owner or lessee a reasonable dominant easement for the production of his minerals while at the same time preserving a viable servient estate. This is particularly important in a State whose most productive resources are oil and agriculture, both of which depend heavily upon declining sources of water. Texas' 177,221 oil wells produced more that 1.2 billion barrels of oil in 1970, with a value in excess of $4 billion, and with jobs furnished for nearly 100,000 people.[9] Approximately 41% of these wells were producing with the aid of some type of secondary recovery process.[10] Total farm income for 1969 was

---

7. Article VII, Section 39, Constitution of 1866, V Gammel's Laws of Texas 880: "That the State of Texas hereby releases to the owner of the soil all mines and mineral substances, that may be on the same, subject to such uniform rate of taxation, as the Legislature may impose." The provision was re-adopted in substantially the same words as Section 9, Article IX of the Constitution of 1869 and as Section 7, Article XIV of the present Constitution of 1876.

8. Browder, The Dominant Oil and Gas Estate-Master or Servant of the Servient Estate, 17 SW.L.J. 25, 46 (1963); McCoy, Annual Survey of Texas Law Oil and Gas, 26 SW.L.J. 59 (1972); Com-

ment, Land Uses Permitted an Oil and Gas Lessee, 37 Texas L.Rev. 889 (1959); 3 St. Mary's L.J. 355 (1971); 50 Texas L.Rev. 806 (1972); 22 SW. L.J. 366 (1968).

9. Annual Report, Oil and Gas Division, p. 9, Railroad Commission of Texas (1970); U. S. Bureau of Mines, Texas Mineral Production and Values, as published in 1972 Texas Almanac at p. 402; Texas Employment Commission, Texas Civilian Labor Force, id. pp. 450–451.

10. Secondary Recovery and Pressure Maintenance Operations in Texas, Oil and Gas Division, Railroad Commission of Texas (1970). As of January 1,

in excess of $3.4 billion and furnished employment for nearly 300,000 persons.[11] More than half of the total value of Texas crops is estimated to be produced through irrigation of 8,206,249 acres in 146 counties, which have a total of 83,115 irrigation wells.[12] In addition, by 1967 there was an estimated 272,000 fresh water ponds, lakes and reservoirs of less than 200 acre-feet of storage capacity covering approximately 457,000 surface acres.[13] Section 5.140 of the Texas Water Code permits these reservoirs to be constructed and the impounded water to be used for domestic and livestock purposes without obtaining permits from the Texas Water Rights Commission. The State has expressed its concern for conservation and protection of these small surface reservoirs [14] and the ground waters of the State through Acts of the Legislature.[15]

The majority opinion today applies directly to 4,200,000 barrels of fresh water to be taken without compensation to the owner of only one 267 acre irrigated farm, whose usefulness will be diminished and shortened for a period of at least eight years. However, the rationale of the opinion is so far reaching that it could be applied to any and all of the ground waters of the 8,206,249 acres now under irrigation which underlie acreage covered by similar oil and gas leases, if and when all or a substantial portion of such waters can be shown to be reasonably necessary for injection into a producing oil stratum for repressuring through a secondary water flooding process. The majority is establishing a precedent for untenable conflicts in which the dominant estate may not only properly occupy and use the surface and reasonable amounts of water for primary drilling and production operations but also completely consume and destroy the surface owners' fresh water supply without compensation even if there is no express grant of free use of water for operations under the lease. No such right of total consumption of a fresh water supply and its destruction of surface uses for agricultural purposes should be implied in any oil and gas lease which is silent on the subject.[16]

1970 there were 75,410 oil wells involved in secondary recovery and pressure maintenance processes served by 22,066 injection wells, of which 2,475 employed fresh water injections.

11. U. S. Department of Agriculture Reports, Texas Cash Farm Income 1961–1969, as published in 1972 Texas Almanac at p. 422; Texas Employment Commission, Texas Civilian Labor Force, id. pp. 450–451.

12. Report 127—Inventories of Irrigation in Texas–1958, 1964, 1969, p. 34 Texas Water Development Board (1971).

13. Texas Water Development Board; Surface Water Division Records, 1967.

14. Sec. 5.141, Texas Water Code. Permits are required for conversion to uses other than domestic and livestock purposes.

15. Chapter 52, Secs. 52.001 et seq, Texas Water Code. Also see Article 6004 requiring oil operators to set casing "in such manner as shall exclude all surface or fresh water from the lower part of such well from penetrating the oil or gas bearing rock"; Sec. 13 of Article 6005 relating to protection of waters against pollution; and Rule 8(A) and (B) of the Texas Railroad Commission prohibiting pollution of fresh water "which will occur as the result of the escape or release or injection of oil, gas, salt water or other mineralized waters from any well"; Rule 13 requiring the operator of any well "to set and cement a sufficient amount of surface casing to protect fresh water sands which are now, or may be, a source of water supply for the area or field"; and Rule 7 which requires the sealing off of each stratum of hydrocarbon fluids in any well drilled for oil and gas so that "each such stratum shall be adequately protected from infiltrating waters."

16. See A. J. Lossee, Legal Problems of a Water Supply for the Oil and Gas Industry, SW. Legal Foundation, 20th Institute on Oil and Gas Law, 1969, p. 55. At p. 67 the author says: "Although the implied easement for free use of water for drilling and development purposes would seem to authorize the use of water for secondary recovery purposes, it would appear that we may be at the junction of the law that because of the quantity of water necessary and

In view of this Court's previous leadership in considering accommodations between dominant and servient estates, it is particularly regrettable that today this Court becomes the first to say that the dominant estate is once again so sovereign that it has the implied right to take, consume and destroy the fresh water supply of a surface owner for a secondary water flooding project without compensation. I have found no case in any jurisdiction which has heretofore made such a holding. Those cited by the majority certainly have not gone so far, although they contain broad dicta which is carried over from the 1862 case of Cowan v. Hardeman and the precedents it follows from both Spanish and English crown ownership cases.

For instance, the majority's quotation from Guffey v. Stroud, 16 S.W.2d 527 (Tex.Com.App.1929) is pure dictum and the holding of the case is contrary to the point for which it is cited. That case involved no dispute as to water. It was a suit by the owner of a gas lease (Stroud) against the owner of an oil lease (Guffey) on the same tract of land to stop the oil lessee from using or wasting the gas in the process of drilling for oil. Judge Ocie Speer, writing for the Court, brushed aside the gas owner's claim for waste of gas encountered in Guffey's attempt to find oil, saying that Guffey's "right to take the oil carried with it by implication the right to tap the gas pockets and to bring to the surface so much of the gas as was necessary in the proper drilling for oil," adding that "it cannot be said that all use of, or interference with, the gas in place was wrongful as against defendant in error. The rule in Shylock's case is not controlling." However, it is quite important to note that Guffey's oil well having turned out to be non-productive of oil but productive of gas, the court upheld the gas lessee's injunction against Guffey and prevented him from producing any more of the gas. Sun,

if the oil lessee in that case would probably argue that it had the implied right to use the gas for repressuring the oil sand, but the court held that the gas belonged exclusively to the gas lessee (Stroud) and that he was entitled to enjoin the oil lessee (Guffey) from further interfering with the gas.

Stradley v. Magnolia Petroleum Company, 155 S.W.2d 649 (Tex.Civ.App.1941 writ ref'd) related only to water used in ordinary primary drilling and production operations of the nature that is clearly recognized and approved by all decisions which have considered this ordinary type of water use. It did not involve secondary water flooding or any substantial depletion or diminishing of the water or the surface estate, and it was not so contended. It is authority, however, for considering along with other factors "the information of the grantor and grantee in order to ascertain the intention of the parties." p. 652.

With due respect, three of the cases cited by the majority for the statement that "Courts have held waterflood projects to be reasonably necessary operations under oil and gas leases" do not so hold, and none of them involve fresh water flooding to the extent of depleting the surface owner's supply for irrigation or alleged diminishment of the value of the surface estate. Carroll v. Roger Lacy, Inc., 402 S.W.2d 307 (Tex.Civ.App.1966, writ ref. n. r. e.) does not mention water flooding; it holds that the lessee under a "free wood and water" clause may pump the lessor's pond dry while using the water in drilling for oil, a holding which this Court now impliedly approves. Gulf Oil Co. v. Walton, 317 S.W. 2d 260 (Tex.Civ.App.1958, n. w. h.) was a suit by the surface owner to enjoin the oil lessee from constructing new roads over his ranch to a series of proposed injection wells to be drilled for water flooding purposes and to force the lessee to use abandoned wells for such purposes; the Court

---

the destruction to the surface estate, a limitation will eventually be placed upon the rule." Trelease, The Use of Fresh

Water for Secondary Recovery of Oil in Rocky Mountain States, 16 Rocky Mt.Min.Law Inst. 605 (1970).

held that the lessee had the right to make its own location of the injection wells and the access roads; no mention is made of the type or source of the water to be derived for such injections. Utilities Production Corp. v. Carter Oil Co., 2 F.Supp. 81 (N.D.Okl.1933) aff'd 72 F.2d 655 (10th Cir.1934), was not a water flooding case; it involved only gas, and the Court simply held that gas produced with the oil could be returned to the sand for repressuring. Only Tidewater Oil Co. v. Penix, 223 F. Supp. 215 (E.D.Okl.1963) involved a dispute over the right to use fresh water from the leased premises for water flooding; the court held that the lessee had the implied right to make the uses complained of only after finding (at p. 217) that "no crops were growing on said land at the time" and that the surface owner "has suffered no damage by reason of the operations of Tidewater on the lease . . . and present or prospective value of the land did not depreciate in value because of said operations."

Holt v. Southwest Antioch Sand Unit, Fifth Enlarged, 292 P.2d 998 (Okl.1955), from which the majority quotes one sentence, was a salt water flooding operation, which the court approved as within the implied rights of the lessee under a standard oil, gas and mineral lease. However, three sentences before the one quoted by the majority, the Oklahoma court was careful to say (at p. 1000):

"We need not and do not here consider whether or not different rules of law are applicable to fresh water recovered from a shallow structure and to salt water recovered from a relatively deep structure."

Citation of the above case by the majority with apparent approval as to an equally extensive use of fresh water is unfortunate not only because of the determining effect which it gives to the decision in the present case, but because of the possible extent of the decision as to an implied right to use fresh water for repressuring

the sands under other lands in a common formation. The Oklahoma court held that the salt water under the complaining surface owner's land could be used to repressure the "common source of supply . . . operated as a single operation with all lessees sharing equitably in the production from the whole." Immediately following the sentence from this case quoted by the majority, the Oklahoma court said: "It makes no difference whether the oil was produced from plaintiff's land or not by reason of the repressuring process." It cites and quotes the Texas case of Stradley v. Magnolia Petroleum Co., supra, as its only authority for this holding. Obviously, until today this was an unwarranted extension of what *Stradley* actually held.

The Illinois case of Carter Oil Co. v. Dees, 340 Ill.App. 449, 92 N.E.2d 519 (1950), cited by the majority, lends scant support to the holding here. The Illinois court merely held that the lessee had the implied right to shut down one of four wells and use it for a gas injection process which would yield an ultimate recovery of more oil from the remaining three wells than would have been produced from all four wells without the gas pressuring process. The source of the gas to be used was not indicated, and the court specifically found (92 N.E. at p. 524) that the process resulted in "no factor of detriment, deprivation or pecuniary loss" to the plaintiff lessors.

### Reasonable Necessity

The majority opinion says that the *Getty* test of reasonable necessity and with due regard to the uses being made by the surface owner is not applicable here because the only possible reasonable alternatives for secondary recovery water are not on the leased premises. While it is true that *Getty* involved only the leased premises, its rationale is not limited to reasonable alternatives located on the leased premises. In this day of unitizations, availability of fuel and water from other sources at economi-

cally feasible costs, and customary field and industry practices of often purchasing secondary recovery water from other sources, the *Getty* rule should not be limited to alternatives involving only the leased premises in this and all future cases.[17]

In *Getty* we recognized, once again, that a severed mineral estate carries with it a dominant easement for the purposes of the mineral lease, but our opinions on original submission and rehearing should have dissipated any idea that the right of the owner of the mineral lease to use of the surface is absolute or unfettered. We not only reemphasized the limitations on the rights of the owner of the mineral lease to uses which are reasonably necessary and which are made with due regard for the rights of the surface owner, but we also held that the selection of a use which unduly interferes with existing uses by the surface owner, if there are reasonable alternatives available to the mineral lessee, will be held unreasonable and, consequently, not reasonably necessary to effectuate the purposes of the lease. The question is divided, therefore, into two parts: (1) Does Sun's use of Ogallala water underlying Whitaker's tract unduly interfere with Whitaker's surface use? (2) Does Sun have a reasonable alternative?

The jury made three findings which have a material bearing on proper answers to the questions. In answer to Special Issue Nos. 3, 4 and 7, the jury found that: ". . . the use of fresh water by Sun Oil Company for secondary recovery purposes from the well which it has drilled on said tract will materially affect the supply which the surface owner could produce by wells"; ". . . it is not reasonably necessary for Sun Oil Company to use water from the Ogallala formation underlying the Whitaker farm to waterflood the L. D. Gann lease"; and ". . . the proposed use of fresh water by Sun Oil Company

for waterflood purposes will substantially devalue the farm owned by the Defendant Whitaker." These fact findings are supported by probative evidence which may be summarized as follows: The Ogallala formation is a depletable and isolated underground reservoir in which the water is not replenished except by such surface water as may percolate down into the reservoir. It is the only source of water available to Whitaker for domestic and irrigation purposes, and the water was being so used by him before Sun entered upon its waterflood project. Sun proposes to produce from its single well and to consume 4,200,000 barrels of the water, which use will shorten the life of Whitaker's water supply by at least eight years. This will cause a substantial decrease in the value of the land. Sun admitted that it "would be physically possible to purchase water to use in waterflooding the L. D. Gann lease involved in this case", and one of its expert witnesses testified that in his opinion it would be economically feasible to purchase water for water flooding the lease; that in his opinion the cost would be about $42,000.00 for the necessary 4,200,000 barrels; and after paying for the water and the oil royalty there should be a net value of $2,000,000 in additional oil recovered from the water flooding project.

As to the *Getty* test of whether there are established practices in the industry which furnish a reasonable alternative for recovering the oil without the uncompensated diminishment of the water supply, agricultural use and value of Whitaker's land, Sun's witness testified that Pan American, Texaco, Skelly, and other operators in the area were buying their water in some instances for water flooding purposes. Further, Sun admitted that with respect to other lands underlaid with ground water deposits on which it holds leases with similar terms, it has purchased water for water flooding purposes from sources other than

17. The prior opinion of the Court, this day withdrawn, applied the *Getty* test in affirming the lower courts. 15 Tex.Sup. Ct.J. 60 (1971). Because I agree with what was originally written, I hereafter borrow freely from the wording of the prior opinion on this phase of the case.

the land covered by the lease for operations on a unitized basis, but not on a single lease basis. The record clearly reveals that Sun itself in some instances and other operators in the area sometimes employ the alternative of purchasing their secondary recovery water from sources other than the lands covered by their leases.

This evidence lends further support to our complimentary observation on motion for rehearing in *Getty* that the usual and customary practice of the oil and gas operators of this State is to take due consideration of the uses being made by the surface owners, and that this perhaps accounts for the relatively few reported cases of conflicts between the dominant and servient owners on the more than 378,000 oil and gas wells that have been drilled, operated and produced in this State. We have had but few cases before this Court where the lessee has sought to assert the dominance of its rights to the extent contended for by the lessee in *Getty* and by Sun in the present case. It remains to be seen whether the previous considerations and accommodations practiced by most operators toward surface owners will continue after what the majority has declared to be the law today.

In the future, landowners who learn about this decision can avoid some of its effect, if they so desire, by specifically prohibiting the use of fresh water for repressuring, pressure maintenance, cycling, and secondary recovery operations. However, owners of millions of acres of land on which the minerals heretofore have been severed, including over 7 million acres of Relinquishment Act lands, and those who now have outstanding Sun-Gann type leases, including those on University lands,[18] will be confronted with the rationale of the majority opinion as long as it remains the controlling law on this subject.

In the present case, there was evidence of probative value in support of the existence of a reasonable alternative practiced by operators in the area by which Sun could obtain water at an economically feasible cost for the conduct of its secondary recovery operations without consuming Whitaker's water and diminishing the value and utility of his surface without compensation, and this supports the jury finding that "it is not reasonably necessary for Sun Oil Company to use water from the Ogallala formation underlying the Whitaker farm to waterflood the L. D. Gann lease."

The jury findings compel the conclusion that Sun's use of 4,200,000 barrels of the Ogallala water underlying the Whitaker tract (1) constitutes an undue interference with Whitaker's reasonable use of the surface, and that (2) Sun has a reasonable alternative. The judgments of the courts below correctly denied Sun's prayer for an injunction and correctly awarded injunctive relief and damages to Whitaker. However, the judgment for damages should be reformed so as to eliminate interest on the $431.00 for damage to growing crops, which Sun has paid into the registry of the court to be disbursed to Whitaker, and the award of $2500.00 for exemplary damages. The evidence does not support a conclusion that Sun's production and use of the water in the waterflood project was, or is, "of a wanton and malicious nature, or, as sometimes stated, somewhat of a criminal or wanton nature." Ware v. Paxton, 359 S.W.2d 897, 899 (Tex.1962). Whether Sun's lease authorized free use of the water in the waterflood project was a question of first impression in this State, and continued production of the oil was manifestly justified considering that rights of royalty owners were also involved. I would reform the judgments of the courts below by reducing

18. Permanent University Fund lands are leased for oil and gas by The Board for Lease of University Lands (Section 66.61 et seq, Education Code), while other land management and control, including water, is vested in the Board of Regents of the University of Texas System. (Sections 66.41–66.44, Education Code). Both references are to Vernon's Texas Codes Annotated.

the sum recovered by Whitaker to $9,667.03, with interest thereon at the rate of 6% from April 30, 1969, the date of the trial court's judgment, until paid.

GREENHILL, STEAKLEY and DENTON, JJ., join in this dissent.

## ON REHEARING

### PER CURIAM.

Justice Walker was on the bench at the time this cause was argued on February 17, 1971, but thereafter voluntarily recused himself from the case and did not participate in the decision of this court. During the consideration of the cause on rehearing the court was evenly divided. The court is therefore required to determine whether Justice Walker is disqualified from serving in this case.

Justice Walker and eleven of his cousins are undivided owners of about three hundred acres of mineral classified land in Reeves County which was under lease to Sun Oil Company. The family executed the lease in 1961, and it was later assigned to Sun. On April 19, 1971, after the submission of this cause, Sun initiated negotiations with the owners concerning the execution of a new lease which would commence after the expiration of the old lease on October 18, 1971. Thereafter Forest Oil Corporation, the owner of a lease of adjoining acreage, also began negotiations to obtain a lease on the same lands. The General Land Office, in line with its policy not to approve a lease on mineral classified lands while there is an existing lease on the land, refused to consider any new lease executed prior to termination of the existing lease. During June, 1971, the surface owners, Sun, Forest Oil Corporation and the Commissioner of the General Land Office, executed, as an amendment to the existing lease, a unitization agreement covering the land owned by the members of Justice Walker's family and the adjoining land held under lease by Forest Oil Corporation. The consideration for the execu-

tion of the new agreement was a bonus and royalty, both of which were equally divided and paid to the surface owners of the land held under lease by Sun and to the Commissioner of the General Land Office. Because of these transactions, Justice Walker determined that he would recuse himself from this case.

Justice Walker has engaged in no other transaction with Sun, owns no stock or other interest in that company, holds no private interest in the subject matter of the dispute in this suit, and knows of no other reason for which he might be disqualified.

The court, in making this decision, has done so without Justice Walker's participation, in line with the practice employed in State v. Valmont Plantations, Tex.Civ. App., 346 S.W.2d 853 at 885, opinion adopted by Supreme Court, 163 Tex. 381, 355 S.W.2d 502 (1962), and Love v. Wilcox, 119 Tex. 256, 28 S.W.2d 515 (1930).

Article V, Section 11, of the Texas Constitution provides that no judge shall sit in any case "wherein he may be interested . . . ." See also Art. 15, Vern.Ann. Tex.Stats. It is a settled principle of law that the interest which disqualifies a judge is that interest, however small, which rests upon a direct pecuniary or personal interest in the result of the case presented to the judge or court. Hidalgo County Water Improvement Dist. No. 2 v. Blalock, 157 Tex. 206, 301 S.W.2d 593 (1957); City of Oak Cliff v. State ex rel. Gill, 97 Tex. 391, 79 S.W. 1068 (1904); Hubbard v. Hamilton County, 113 Tex. 547, 261 S.W. 990 (1924). Justice Walker at no time has held such an interest in the case before us.

A judge's sense of propriety is often good reason for a judge to recuse himself voluntarily as Justice Walker did. In a situation such as is here presented, however, there are other considerations. We held in Hidalgo County Water Control and Improvement Dist. No. 1 v. Boysen, 354 S.W.2d 420, 423 (Tex.Civ.App.1962, writ ref'd), that " . . . the Constitution does not contemplate that judicial machin-

ery shall stop." See also Hidalgo & Cameron Counties Water Control etc. v. Starley, 373 S.W.2d 731 (Tex.1964); Hidalgo County Water Improvement Dist. No. 2 v. Blalock, 157 Tex. 206, 301 S.W.2d 593 (1957).

We hold that Justice Walker is qualified to participate in the decision of this cause on rehearing and, further, that it is his duty to serve. Love v. Wilcox. *supra.*