The SUPERIOR OIL COMPANY,
Appellant,

v.

RAILROAD COMMISSION of Texas
et al., Appellees.

No. 12766.

Court of Civil Appeals of Texas,
Austin.

Aug. 30, 1978.
Rehearing Denied Oct. 4, 1978.

**52**

Philip F. Patman, Patman & Patman, Austin, for appellant.

John L. Hill, Atty. Gen., Ralph T. Aldave, Asst. Atty. Gen., Austin, for appellee Railroad Commission.

William T. Hall, Hall & Laden Assoc., Austin, for intervenor Atlantic Richfield Co.

C. C. Small, Jr., Small, Craig & Werkenthin, Austin, for intervenor General American Oil Co. of Texas.

Robert C. McGinnis, Dean M. Kilgore, McGinnis, Lochridge & Kilgore, Austin, for intervenors Exxon Corp. and Sun Oil Co.

O'QUINN, Justice.

This appeal is from judgment of the district court affirming action of the Railroad Commission in refusing The Superior Oil Company a permit to drill an additional well on its lease in the East Texas Oil Field under an exception to Rule 37. We will affirm the trial court's judgment that The Superior Oil Company take nothing by its suit.

Superior Oil acquired the Helen Pritchard "A" Lease by an assignment dated April 11, 1931, which stated that the lease contained 99.56 acres, determined by survey made in 1931 by the county surveyor. Sixteen years later, in 1947, Superior commissioned another surveyor to survey the tract who found it to contain 100 acres.

It is undisputed that Superior lawfully operated twenty-one producing wells on its Helen Pritchard lease until 1973, when its No. 10 well "went to water." To replace the well, Superior applied to the Railroad Commission for permit to drill a new well.

By memorandum approved July 1, 1957, the Railroad Commission established exceptions statewide to Rule 37 and the density policy for East Texas Field applications. In this lawsuit the standard density policy of one well to five acres and the exceptions contained in paragraphs four and five of the memorandum are the rules under consideration.

Paragraph *four* of the memorandum provides that permits to drill *additional* wells will be granted for a tract completely sur-

rounded by production which has sufficient acreage to *comply with the five acre density rule,* and further provides that the new well must be located in the *most sparsely drilled area* of the tract.

Paragraph *five* provides that when a tract has been legally developed in excess of the five acre density rule (that is, developed *prior* to the 1957 memorandum), a new drilling permit will be granted only for a *substitute* well for an existing well that has encountered mechanical difficulties. The *substitute* well must be located ". . . as close as is mechanically practical to the existing well . . . [and] such distance will generally be considered as being 50 feet."

Superior's first effort to obtain authority to drill a new well was made pursuant to paragraph five, inasmuch as Superior, from the time of its acquisition of the lease had claimed the tract contained either 99.56 or 100 acres. But the location proposed for the substitute well was 1,180 feet from No. 10 well and in the most sparsely drilled area of the lease. Superior claimed this location was necessary because ". . . location as near to the existing well as fifty feet provided in paragraph five . . . would not accord it reasonable opportunity to complete the new well as an oil producer . . . :"

At the close of testimony before the Commission parties protesting the application asked that the permit be denied, since Superior had failed to locate the *substitute* well fifty feet or less from No. 10 and in addition had proposed a location in the most sparsely drilled area of the lease. Protestants took the position that Superior could not attempt to comply with the more liberal location requirements of paragraph *four* because Superior did not have sufficient acreage to justify an *additional* well, and was entitled to a new well only if Superior complied with the more stringent location requirements of paragraph *five*.

Superior at this point retained services of a surveying firm to survey the lease tract, after which it was claimed the tract contained 106.48 acres. When Superior sought to reopen the hearing before the Commission to permit introduction of the new evidence, objection was made and Superior withdrew its application and subsequently filed a new application to drill an *additional* well, to be its twenty-first on the lease tract, which Superior represented in the new application to contain 106.48 acres.

At the conclusion of the hearing on Superior's application to drill an additional well on the lease tract now claimed to comprise 106.48 acres, the hearing examiners filed their proposal for decision, containing findings of fact and conclusions of law which the Railroad Commission subsequently adopted in its order dismissing the application without prejudice.

The findings of fact consisted of findings (1) that proper notice had been given all offset operators and (2) that the greater percentage of the testimony pertained to boundaries of the Superior lease "and to the enlargement of the Superior lease from 99.56 acres to 106.48 acres."

The conclusions of law were (1) that Superior "made a good faith claim to the Commission in the drilling of 21 wells on less than 100 acres," and (2) that "the enlargement of the tract . . . by establishing new boundary lines, which were disputed . . . is a title question over which the Commission has no jurisdiction."

In district court the parties were in agreement that the effect of the Commission's order was to conclude that Superior had failed to prove a good faith claim to 106.48 acres in the lease tract. Without objection the case was tried on the issue of sufficiency of evidence to support the Commission's inferred finding and conclusion that Superior did not show a good faith claim to 106.48 acres. In its judgment the trial court found that the order of the Commission ". . . to the effect that The Superior Oil Company . . . failed to make a reasonably satisfactory showing of a good-faith claim to 106.48 acres . . . was reasonably supported by substantial evidence, and that . . . [Superior] should take nothing by its suit."

On appeal Superior for the first time challenges the legal sufficiency of the findings of fact by the Commission in support of the order. It is evident that the findings and conclusions adopted by the Commission, for clarity and relevance, are unlikely models for drafting administrative orders, but we find in the record no pleadings or objections directed at the deficiencies and that the case was tried on the theory, accepted by all parties, that the Commission dismissed Superior's application because a reasonably satisfactory showing had not been made of a good faith claim to 106.48 acres. The issue on appeal is simply whether there was substantial evidence to support that conclusion.

Superior brings four points of error which in their most essential aspect claim there was not substantial evidence to support the Commission's decision because ". . . a contemporary survey by a State-licensed land surveyor showing its . . . LEASE . . . to be composed of 106.48 acres of land constitutes *as a matter of law* a reasonably satisfactory showing of a good-faith claim in and to such amount of acreage." (Emphasis added).

At the hearing upon which the Commission based its order Superior sought through the testimony of two surveyors as experts to show that the lease tract actually contained 106.48 acres, although from 1931 to 1947 Superior had claimed 99.56 acres and after 1947 had claimed 100 acres, both claims based on surveys made by or for Superior. The survey offered at the hearing was a new survey made by Hart Engineering of Longview, and the first witness was a licensed surveyor employed by that company, but not the surveyor who performed the field work.

Protestants at the hearing did not offer witnesses, but limited their evidence in the main to cross examination of Superior's expert witnesses. On cross examination the surveyor for Hart Engineering conceded that he "didn't pay any attention" to calls and distances in some instances as shown by the survey of 1931 under which Superior took the lease originally and explained, "At that time, I figure some attorney set back in his office and wrote those things and I didn't pay any attention to them." The witness also testified that he paid "not too much" attention to field notes of the surveys of 1931 and 1947, although he sought at the hearing to impeach validity of these earlier surveys. It is clear that the witness made no attempt to locate the lease on the ground by its description, but instead based the recent survey on what "occupation" the witness could use.

The recent survey, based on occupation of the land, was not performed by the witness but was made from field notes of surveyors under his supervision. Description in the new survey began from a three-quarter inch iron pipe, but the witness did not know whether the pipe was called for in the field notes. To obtain a bearing from the iron pipe, the surveyor relied on hack marks on a ten-inch "fig [pig] nut tree," the origin of which was unknown to him and which he conceded probably was not standing when the lease was surveyed in 1931 by the county surveyor.

In the last part of the hearing it was disclosed that the witness had gone to the lease tract himself in an attempt to locate the lease on the ground by use of metes and bounds description which made reference specifically to the field note descriptions of three surrounding tracts, but the witness abandoned the field notes for description whenever found inconsistent with his first survey based on occupation. Thus it became evident that no attempt had been made in behalf of Superior to retrace the steps of the surveyors who performed the surveys of 1931 and 1947 in order to test or determine accuracy of these earlier surveys.

The conclusions of this witness, that the tract contained more than 100 acres, were corroborated by a second surveyor who, without field investigation but by using a planimeter (an office device employed to estimate an area by tracing its boundaries on a map), testified that the tract certified in 1947 as comprising 100 acres appeared to contain 112.94 acres.

■ The record reflects no effort made to show that either the survey of 1931, calling for 99.56 acres, or the survey of 1947, calling for 100 acres, contains calls or distances which are inconsistent or otherwise ambiguous. Generally the boundaries of a tract are to be determined by the lines and corners actually run and marked on the ground by the surveyor who made the survey in accordance with which the deed was made. In this case the rule would apply to the survey made in 1931 when Superior took the lease. The footsteps of the surveyor must be followed when ascertainable in determining the true boundary lines. See 9 Tex.Jur.2d *Boundaries,* sec. 12, pp. 522 et seq., and authorities cited (1969).

By claiming ownership of 106.48 acres, Superior sought to impeach its forty-five year-old claim to not more than 100 acres, under the survey made when Superior acquired the lease, and the subsequent survey in 1947 which Superior made. Superior's surveyors of 1976 made no attempt to trace the steps of the earlier surveyors whose descriptions are specific and unambiguous as to the boundaries of the lease.

Under the record the Commission could have concluded that a reasonably good faith claim begins to falter and fail when recognized standards for ascertaining known boundaries of a lease, as a basis for a new calculation of the area within the boundaries of the deed, are not employed but are consistently avoided. Moreover, Superior repeatedly resisted attempts by opposing parties to have produced at the hearing field books and working sketches used by Superior's witness by whom the applicant sought to prove that past surveys erroneously showed no more than 100 acres in the lease tract.

Some foremost precepts for surveyors, called upon to establish the actual boundaries and the area within the boundaries of a tract acquired by deed, are stated in this language:

"The cardinal principle guiding a surveyor who is running the lines of a previous survey is to follow in the footsteps of the previous surveyor. The essential rule of a resurvey is to follow the steps of the first survey . . . It is the extensive duty of the retracing surveyor to see what the first surveyor did, not what he should have done. No matter how inaccurate the original survey may have been, it will be conclusively presumed to be correct and, if there is error in the measurements or otherwise, such error is the error of the last surveyor . . ." Grimes, *Clark on Surveying and Boundaries,* Sec. 275, p. 339 (4th ed. 1976).

The second surveyor testifying for Superior at the hearing undertook to impeach the company's own certified survey of 1947, not by resurvey on the ground, but by using a planimeter, which at best merely estimates the area within boundary lines of a tract delineated on a map. The witness employed the planimeter, not on an original map as compiled from field notes, but upon a Xerox copy, which the witness admitted might have been distorted in the copying process. From this presumption upon a presumption the witness arrived at 112.94 acres, which was in conflict with any other acreage attributed to the lease tract.

In bringing suit Superior invoked provisions of Section 19(e) of Article 6252–13a (Administrative Procedure and Texas Register Act), and review in district court was under the substantial evidence rule. The question below and on appeal is whether there was substantial evidence before the administrative agency in support of the Commission's finding that Superior failed to make a good faith claim in 106.48 acres in the lease tract.

■ The established rule guiding the Railroad Commission was stated in 1943, by the Supreme Court in this language: ". . . the Railroad Commission should not do the useless thing of granting a permit to one who does not claim the property in good faith. The Commission should deny the permit if it does not reasonably appear to it that the applicant has a good-faith claim in the property." *Magnolia Petroleum Co. v. Railroad Commission,* 141 Tex. 96, 170 S.W.2d 189, 191 (1943). The rule was reaffirmed by the Supreme Court in *Trapp*

*v. Shell Oil Co.*, 145 Tex. 323, 198 S.W.2d 424, 437 (1946).

Superior mistakenly contends that the Commission may not inquire into validity of a survey by a state-licensed surveyor because any such survey constitutes a good faith claim as a matter of law. For more than forty years Superior maintained a good faith claim to 100 acres, a claim supported by the surveys of 1931 and 1947. After failing to obtain a permit for a *substitute* well, as authorized under the 1957 memorandum, Superior sought a permit to drill an *additional* well by rejecting its good faith claim of the past and advancing a new claim that the lease tract comprised 106.48 acres.

It seems obvious that as a part of its new claim Superior had the burden to show how the good faith claim already established and recognized by the Commission was defective and the new claim was without imperfection. The Commission evidently concluded that Superior was unable to overcome the presumption of correctness of its previous claims of ownership. We find there was substantial evidence to support the Commission's order denying the permit.

The judgment of the trial court is affirmed.

Affirmed.