# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-09-00015-CV

**Stanley H. Rosenthal, Appellant**

**v.**

**Railroad Commission of Texas and K-3 Resources LP, Appellees**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT
### NO. D-1-GN-07-002740, HONORABLE SCOTT H. JENKINS, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

This is an administrative appeal of a railroad commission final order granting a permit authorizing appellee K-3 Resources, LP (K-3) to operate a commercial disposal well on a tract of land where its subsidiary owns the surface estate. Appellant Stanley H. Rosenthal, who owns the tract's mineral estate, unsuccessfully protested K-3's permit application before the commission, then sought judicial review of the commission's order in the district court. The district court affirmed the commission's order. Rosenthal now appeals the district court's judgment. The principal issue on appeal concerns whether there was substantial evidence to support the commission's legal conclusion that K-3, as the surface owner, has a good-faith claim to the right to use the tract for saltwater disposal by underground injection. We will affirm the district court's judgment affirming the commission's order.

## BACKGROUND

In June 2006, K-3 filed a permit application with the commission seeking authority to operate a previously completed oil and gas well as a commercial disposal well. The well is located in the Hamman Field, in Matagorda County, on a tract of approximately thirty-four acres that the parties term the "E. Richers" or "Richers" lease or tract, a reference to the fee owner who originally executed an oil and gas lease on the tract in 1933. The well is similarly identified as the "E. Richers No. 2" or "Richers No. 2." Since 1972, Rosenthal has owned one-hundred percent of the oil, gas, and mineral leasehold estate in the Richers tract. In January 2006, the surface estate in the Richers tract was purchased by Bay City Black Cats, L.P., a wholly owned subsidiary of K-3. In that same month, K-3 also purchased the E. Richers No. 2 "wellbore" and "all equipment, personal property and fixtures."

K-3 sought authority to commercially dispose of salt water produced from area oil and gas wells by injecting it underground through the Richers No. 2. K-3's permit application invoked the commission's authority under chapter 27 of the water code, the Injection Well Act. *See* Tex. Water Code Ann. § 27.001 (West 2008). Section 27.031 of the water code prohibits any "person" from drilling, continuing to use, or converting an existing well into a "disposal well to dispose of oil and gas waste without first obtaining a permit from the railroad commission."

*Id.* § 27.031 (West 2008).[1] The commission may grant an application in whole or part and issue the permit if it finds:

(1)     that the use or installation of the injection well[2] is in the public interest;

(2)     that the use or installation of the injection well will not endanger or injure any oil, gas, or other mineral formation;

(3)     that, with proper safeguards, both ground and surface fresh water can be adequately protected from pollution; and

(4)     that the applicant has made a satisfactory showing of financial responsibility if required by Section 27.073 of this code.

*Id.* § 27.051(b) (West 2008). When issuing a permit, the commission shall also "impose terms and conditions reasonably necessary to protect fresh water from pollution, including the necessary casing." *Id.* § 27.051(c).

As its application was ultimately amended, K-3 sought approval to operate a commercial disposal well that would inject salt water into a subterranean interval or zone that was not productive of oil or gas. Such applications are governed by the commission's Statewide Rule 9. *See* 16 Tex. Admin. Code § 3.9(1) (2009) (Tex. R.R. Comm'n, Disposal Wells) ("[s]altwater or other oil and gas waste, as that term is defined in the Texas Water Code, Chapter 27,

---

[1]  A "disposal well" is "an injection well that is used for the injection of . . . oil and gas waste." Tex. Water Code Ann. § 27.002(10) (West 2008). An "injection well" is defined, in relevant part, as "a well initially drilled to produce oil and gas which is used to transmit, inject, or dispose of . . . oil and gas waste into a subsurface stratum. . . ." *Id.* § 27.002(11). "Oil and gas waste" includes "waste arising out of or incidental to drilling for or producing of oil [or] gas . . . includ[ing] but . . . not limited to salt water, brine, sludge, drilling mud, and other liquid or semi-liquid waste material." *Id.* § 27.002(6).

[2]  As noted, a "disposal well" is a type of "injection well." *See id.* § 27.002(10).

3

may be disposed of, upon application to and approval by the commission, by injection into nonproducing zones of oil, gas, or geothermal resources bearing formations that contain water mineralized by processes of nature to such a degree that the water is unfit for domestic, stock, irrigation, or other general uses" under permit authorizing disposal in accordance with rule's requirements), (4) (defining "commercial disposal well" as "a well whose owner or operator receives compensation from others for the disposal of . . . oil and gas wastes that are wholly or partly trucked or hauled to the well, and the primary business purpose for the well is to provide these services for compensation"). In addition to imposing procedural requirements, *see id.* § 3.9(3)-(5), rule 9 requires the applicant to take various steps to ensure that the formations approved for disposal use "are separated from freshwater formations by impervious beds which will give adequate protection to such freshwater formations." *Id.* § 3.9(2), (7).

Rosenthal protested K-3's application, and an evidentiary hearing on the application was held before commission hearing examiners. *See id.* § 3.9(5)(E). Rosenthal raised concerns that K-3's proposed disposal well would interfere with development of the mineral estate. In its original application, K-3 had sought approval to inject salt water into both non-productive and productive intervals. K-3, as noted, ultimately amended its application to confine disposal to non-productive intervals. Rosenthal also expressed concern with possible "breakout" in the location of the Richers No. 1, a plugged and abandoned well within 1/4 mile of the Richers No. 2. Furthermore, Rosenthal argued that K-3, as the surface estate owner, did not have a sufficient legal basis for using the Richers No. 2 for commercial disposal.

4

The examiners issued a proposal for decision (PFD) recommending that the commission grant the permit with certain conditions. The PFD included proposed findings of fact and conclusions of law. This PFD was presented to the commission in February 2007. The commission remanded the case to the examiners to address whether the proposed well is in the "public interest." The hearing was reopened on April 9, 2007 to consider additional evidence. Thereafter, the hearing examiners issued a revised PFD again recommending K-3's application be granted. On June 27, 2007, the commission entered a final order granting K-3's permit application with certain conditions aimed at ensuring its saltwater disposal did not extend into productive zones or contaminate freshwater sources, including requiring K-3 to re-enter and re-plug the Richers No. 1A.[3]

---

[3] The commission's order imposed the following special conditions:

1. Fluid shall only be injected into strata in the subsurface depth interval from 5,610 feet to 6,450 feet.

2. The injection volume shall not exceed 10,000 barrels of saltwater per day.

3. The maximum operating surface injection pressure shall not exceed 1,500 psig.

4. The authority to inject fluid is limited to salt water.

5. Prior to beginning injection, a cement squeeze must be performed at approximately 5,528 feet, with sufficient cement to provide a total of at least 600 feet of cement coverage by volume behind the casing at the top of the injection interval. . . .

6. Prior to beginning injection, a cement squeeze must be performed at approximately 6,500 feet, with sufficient cement to provide at least 50 feet of cement coverage behind the casing at the base of the injection interval.

The commission's final order adopted the findings of fact and conclusions of law contained in the examiners' revised PFD. The commission's order was based on the ultimate legal conclusion no. 8, that "K-3 . . . has met its burden of proof and satisfied the requirements of Chapter 27.051 of the Texas Water Code and the Railroad Commission's Statewide Rule 9." The commission based this ultimate conclusion, in turn, on the legal conclusions that K-3 had met its burden as to each of the requirements of water code section 27.051.[4] Of significance to Rosenthal's appellate issues, this included conclusion of law no. 4, "The use or installation of the proposed injection well is in the public interest." The commission also made several findings of facts underlying these legal conclusions.[5] This included finding of fact no. 7, which specifically

7.      Prior to beginning injection, the Richers No. 1A [a plugged well within a 1/4 radius of the Richers No. 2] must be re-entered by K-3 . . . and plugged in accordance with Rule 14.

[4] The commission made the following legal conclusions addressed to the requirements of water code section 27.051(b):

4.      The use or installation of the proposed injection well is in the public interest.

5.      The use or installation of the proposed injection well will not endanger or injure any oil, gas, or other mineral formation.

6.      With proper safeguards, as provided by the terms and conditions [adopted by the commission], both ground and surface fresh water can be adequately protected from pollution.

7.      K-3 . . . has made a satisfactory showing of financial responsibility to the extent required by Section 27.073 of the Texas Water Code.

[5] In addition to finding of fact no. 7, the commission's other relevant findings included the following:

2.      The requested disposal interval between 5,610 feet and 6,500 feet in the E. Richers No. 2 is not productive of oil and gas within at least five miles of the E. Richers No. 2.

3.    The E. Richers No. 2 will be cased and cemented in a manner to protect usable quality water.

    a.    The subject well has 1,234 feet of 10 3/4" surface casing cemented to the surface.

    b.    The Texas Commission on Environmental Quality recommends that usable-quality water be protected to 1,200 feet in the area of the proposed well.

4.    The E. Richers No. 2 will be cased and cemented in a manner which will confine[] injected fluids to the injection interval.

    a.    The subject well has approximately 8,937 feet of 7" casing on top of cement at approximately 7,000 feet.

    b.    A bridge plug has been set at 6,500 feet, with 30 feet of cement on top, to isolate open perforations between 8,356 feet and 8,406 feet.

    c.    Prior to initiation of disposal operations, a cement squeeze operation must be performed to provide a total of at least 600 feet of cement behind the production casing above the injection interval.

    d.    Prior to initiation of disposal operations, a cement squeeze must be performed at the base of the disposal interval to provide at least 50 feet of cement behind the production casing at the base of the injection interval.

    e.    Injection will be through tubing set on a packer no higher than 100 feet above the top of the injection interval.

5.    The maximum requested injection volume is 10,000 barrels of water per day and the maximum requested surface injection pressure is 1,500 psi.

6.    Re-entry and proper plugging of the Richers No. 1A is necessary to confirm that there are no conduits for migration of fluids within one-quarter mile of the proposed disposal well.

*  *  *

7

addressed the "public interest" requirement:

> 7. Use of the E. Richers No. 2 as a commercial disposal well is in the public interest to provide necessary additional disposal capacity.
>
>> a. Due to increased oil and gas development in Matagorda County, large quantities of produced water must be disposed of.
>>
>> b. Many existing producing wells in Matagorda County produce high volumes of water. Some have had shut-ins due to insufficient disposal capacity.
>>
>> c. Existing disposal wells in the county are periodically unavailable because they have reached capacity.

The commission also made findings and conclusions addressing Rosenthal's assertions that K-3, as the surface estate owner, did not possess a sufficient legal interest in the affected property to obtain the permit. Its conclusion of law no. 3 stated, "K-3 Resources, L.P. established it possessed a good faith claim of the right to use the E. Richers No. 2 for disposal into non-productive zones." *See Magnolia Petroleum Co. v. Railroad Comm'n*, 170 S.W.2d 189, 191 (Tex. 1943). In support of this conclusion, the commission found the following underlying facts:

> 2. The requested disposal interval between 5,610 feet and 6,500 feet in the E. Richers No. 2 is not productive of oil and gas within at least five miles of the E. Richers No. 2.
>
> * * *
>
> 8. Bay City Black Cats, L.P. purchased the surface estate for the 34.44 acres on which the subject well bore is located in January 2006.

---

> 9. K-3 . . . has an active P-5 on file with the Commission, with $25,000 financial assurance.

8

9. Bay City Black Cats, L.P. is a wholly owned subsidiary of K-3 Resources, L.P.

After exhausting his administrative remedies before the commission, Rosenthal filed a suit for judicial review of the commission's final order in the district court. K-3 intervened in support of the commission's order. The district court affirmed the commission's order. This appeal ensued.

**ANALYSIS**

Rosenthal brings two issues on appeal. In his first issue, he argues that because K-3 owns only the surface estate in the Richers tract, it could not, as a matter of law, establish a "good faith claim" to the right to use subterranean property beneath the Richers No. 2 for saltwater disposal. In his second issue, Rosenthal contends that, for the same reason, the commission's conclusion of law no. 3 that K-3 had a "good faith claim," which is supported by fact findings confirming that K-3 owns only the surface estate, is not reasonably supported by substantial evidence and is arbitrary and capricious. He does not dispute that substantial evidence supports the commission's findings that K-3 owns the surface estate in the Richers tract through its wholly owned subsidiary, only whether those findings can establish a "good faith claim."

In his second issue, Rosenthal also complains that the commission's fact findings regarding the "public interest" requirement of water code section 27.051(b) were deficient and could not support its conclusion that granting the permit was in the public interest.

**Standard of review**

Our review of the commission's final order is governed by the "substantial evidence" standard of the Administrative Procedures Act. Under this standard, we may not substitute our judgment for that of the commission on the weight of the evidence on questions committed to agency discretion. Tex. Gov't Code Ann. § 2001.174 (West 2008). However, we must reverse and remand the commission's order if Rosenthal's substantial rights have been prejudiced because the commission's findings, inferences, conclusions, or decisions (1) violate a constitutional or statutory provision; (2) exceed the commission's statutory authority; (3) were made through unlawful procedure; (4) were affected by other error of law; (5) are not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; or (6) are arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion. *Id.* § 2001.174(2).

The commission's order is presumed valid, and Rosenthal bears the burden of showing a lack of substantial evidence. *City of El Paso v. Public Util. Comm'n*, 883 S.W.2d 179, 185 (Tex. 1994); *Sportscoach Corp. of Am. v. Eastex Camper Sales, Inc.*, 31 S.W.3d 730, 733 (Tex. App.—Austin 2000, no pet.). We review the commission's legal conclusions for errors of law and its findings of fact for support by substantial evidence. *Heat Energy Advanced Tech., Inc. v. West Dallas Coal.*, 962 S.W.2d 288, 294-95 (Tex. App.—Austin 1998, pet. denied). The crux of a substantial evidence analysis is whether the agency's factual findings are reasonable "in light of the evidence from which they were purportedly inferred." *Granek v. Texas State Bd. of Med. Exam'rs*, 172 S.W.3d 761, 778 (Tex. App.—Austin 2005, no pet.) (quoting John E. Powers, Agency

Adjudications 163 (1990)). Substantial evidence does not mean "a large or considerable amount of evidence"; rather, substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion' of fact." *Lauderdale v. Texas Dep't of Agric.*, 923 S.W.2d 834, 836 (Tex. App.—Austin 1996, no writ) (quoting *Pierce v. Underwood*, 487 U.S. 552, 564-65 (1988); *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). To constitute substantial evidence, the reliable and probative evidence in its entirety must be sufficient that reasonable minds could have reached the conclusion that the agency must have reached to justify the disputed action. *Heat Energy Advanced Tech., Inc.*, 962 S.W.2d at 294-95 (citing *Texas State Bd. of Dental Exam'rs v. Sizemore*, 759 S.W.2d 114, 116 (Tex. 1988)). The evidence in the record may preponderate against the agency's decision and still provide a reasonable basis for the decision and satisfy the substantial evidence standard. *Id.* (citing *Nucor Steel v. Public Util. Comm'n*, 168 S.W.3d 260, 267 (Tex. App.—Austin 2005, no pet.)). The fact-finder—here, the hearing examiners—determines the credibility of witnesses and the weight to give their testimony. *See Granek*, 172 S.W.3d at 778. We may not set aside an agency decision merely because testimony was conflicting or disputed, or because it did not compel the agency's decision. *Sanchez v. Texas State Bd. of Med. Exam'rs*, 229 S.W.3d 498, 510 (Tex. App.—Austin 2007, no pet.) (citing *Firemen's & Policemen's Civil Serv. Comm'n v. Brinkmeyer*, 662 S.W.2d 953, 956 (Tex. 1996)). Ultimately we are concerned not with the correctness of the agency's order, but its reasonableness. *Id*.

Whether the commission's order was supported by substantial evidence is a question of law. *Montgomery Indep. Sch. Dist. v. Davis*, 34 S.W.3d 559, 562 (Tex. 2000). The district court's judgment is thus not entitled to deference on appeal. *Texas Dep't of Pub. Safety*

11

*v. Alford*, 209 S.W.3d 101, 103 (Tex. 2006) (per curiam).  On appeal of that judgment, we consider the same question presented to the district court:  whether the commission's order was supported by substantial evidence.  *See Montgomery*, 34 S.W.3d at 562.

**Good-faith claim**

Before turning to the parties' specific contentions regarding the commission's conclusion that K-3 demonstrated a "good faith claim of the right to use the E. Richers No. 2 for disposal into non-productive zones," it is helpful to explain the nature and jurisprudential origins of the requirement to which this conclusion is addressed.  There is no requirement in either water code chapter 27 or rule 9 that K-3 prove its title or right of possession in the subterranean property at issue as a condition of obtaining its commercial disposal permit.  *See* Tex. Water Code Ann. §§ 27.031, .051(b); 16 Tex. Admin. Code § 3.9.  In fact, it is well established that the commission does not have jurisdiction to decide disputes over title or rights of possession in property that is the subject of a permit request.  *See, e.g.*, *Magnolia Petroleum Co.*, 170 S.W.2d at 190-91.  Rather, the commission's authority to grant permits is negative in nature—the commission, through a permit, merely removes a barrier the conservation laws otherwise would impose on use of property, but does not determine or affirmatively create title or a right of possession in the property itself.  *See id.*

The Texas Supreme Court explained these principles in *Magnolia Petroleum*. Magnolia had protested the issuance of a rule 37 drilling permit to E.A. Landman on grounds that Landman had no title to the land where he sought to drill because the land was actually within the boundaries of one of Magnolia's leases.  After the commission granted Landman the permit, Magnolia appealed the order to the Travis County District Court and also filed a separate trespass-to-

12

try-title suit in Gregg County, where the subject property was located. Magnolia prevailed in

the lower courts on the theory that the commission had no power to issue the permit because a

"bona fide title dispute" existed concerning the property. The supreme court rejected the notion that

the commission's power to issue the permit depended on whether the permit applicant could

demonstrate title in the affected property:

> In order to view the problem in its proper perspective, we must first consider the situation as it was at common law, before the conservation statutes were enacted. No permit was then required to drill for oil. If there was a title dispute, the party who had possession, or who could obtain possession peaceably, could drill for oil. If it later developed that he had no title, he had to account of the true owner for the value of the oil removed. Pending settlement of the controversy in a suit brought for that purpose, either party in a proper case might have an injunction to preserve the status quo. Or, upon proper showing, in order to prevent waste, a receiver might be appointed to drill the well and hold the proceeds of the oil to await the outcome of the title suit.
>
> In our opinion, the situation is not materially changed by the conservation laws. . . . The function of the Railroad Commission in this connection is to administer the conservation laws. When it grants a permit to drill a well it does not undertake to adjudicate questions of title or rights of possession. These questions must be settled in the courts. When the permit is granted, the permittee may still have no such title as will authorize him to drill on the land. If other parties are in possession of the property, as in the present case, they may defend their possession by self-help, or by injunction proceedings. Before the permittee can drill, he must first go to court and establish his title. In that suit, upon proper showing, he may have a receiver appointed to drill the well and hold the proceeds to await the final judgment on the title issue. On the other hand, if he has possession, or can obtain possession peaceably, his adversary may resort to the courts for a determination of the title dispute, and therein ask for an injunction or for a receivership. In short, the order granting the permit is purely a negative pronouncement. It grants no affirmative rights to the permittee to occupy the property, and therefore would not cloud his adversary's title. It merely removes the conservation laws and regulations as a bar to drilling the well, and leaves the permittee to his rights at common law. Where there is a dispute as to those rights, it must be settled in court. The permit may

13

> thus be perfectly valid, so far as the conservation laws are concerned, and yet the permittee's right to drill under it may depend upon his establishing title in a suit at law. In such a suit the fact that a permit to drill had been granted would not be admissible in support of permittee's title.

*Id.* at 190-91 (citations omitted). The supreme court and this Court have subsequently held that the same limitations apply to trial and appellate courts when reviewing commission orders granting or denying permits. *See Trapp v. Shell Oil Co.*, 198 S.W.2d 424, 437 (Tex. 1946) ("The duties of the Railroad Commission as given by law do not encompass the power or authority of deciding the ownership of title to land. We think it follows that the appeal [of the commission's order] does not include such power, even though the appeal is to a district court of Travis County which, in a proper case, has such jurisdiction"); *Pan Am. Prod. Co. v. Hollandsworth*, 294 S.W.2d 205, 211-12 (Tex. Civ. App.—Austin 1956, no writ) (in appeal of commission order in another rule 37 case, emphasizing that "neither the Commission, nor the court below, nor this Court had or has authority to determine substantive questions relating to title or possession or other rights affecting the property involved."). In other words, a substantive title dispute arising in the context of commission permitting proceedings cannot be adjudicated in the administrative appeals from such proceedings, but must instead be addressed through other actions that properly invoke the court's jurisdiction to decide the issue, such as a trespass-to-try-title suit. *See Trapp*, 198 S.W.2d at 437.

That is not to say that underlying title issues are entirely irrelevant in commission permit proceedings. In *Magnolia Petroleum*, immediately after it explained the above limitations on commission jurisdiction to determine substantive property rights, the supreme court stated:

14

Of course, the Railroad Commission should not do the useless thing of granting a permit to one who does not claim the property in good faith. The Commission should deny the permit if it does not reasonably appear to it that the applicant has a good-faith claim in the property. If the applicant makes a reasonably satisfactory showing of a good-faith claim of ownership in the property, the mere fact that another in good faith disputes his title is not alone sufficient to defeat his right to the permit; neither is it ground for suspending the permit or abating the statutory appeal pending settlement of the title controversy.

*Id.* at 191. In other words, while a permit applicant is not required to prove title or right of possession in the property affected by the permit, and the commission has no power to decide that question, the applicant nonetheless must make "a reasonably satisfactory showing of a good-faith claim of ownership" in the property. *See id.* This is the origin of the "good-faith claim" requirement to which the commission's conclusion of law no. 3 and findings of fact nos. 2, 8, and 9 are addressed.

Rosenthal argues that the requisite good-faith claim to the right to use the subject property requires "evidence of a legally recognized theory upon which a claim to property may be made even though another contests the grant by an adverse claim to the same property." He reasons that "[h]aving the 'surface estate only,' K-3 has no legally recognized theory of ownership in the property beneath the 'surface estate only' that will allow K-3 to make a reasonable and satisfactory showing of a good faith claim to the property." Rosenthal urges that the "subsurface matrix" K-3 intends to use is instead owned by the Richers and their heirs, the grantors of his oil and gas lease, subject to his rights under the lease. He emphasizes the concept that an oil and gas lease effectively divides a fee simple estate into "two tracts as if the division had been made by superficial lines, or had been severed vertically by horizontal planes"—the surface estate and the severed mineral

15

leasehold estate[6]—and suggests that the surface estate does not include things underground. He also observes that the mineral estate is, as a matter of law, the dominant estate,[7] further asserting that the owner of the dominant mineral estate possesses the implied right under an oil and gas lease to dispose of salt water produced in operations on the lease and may do so by injecting it into a well on the lease premises.[8] From this, Rosenthal reasons that "K-3, having no leasehold rights, does not have a right to dispose of oil and gas waste produced from the [Richers] tract, not even through the Richers No. 2 wellbore." He also refers to hearing testimony in which he asserted his claim of ownership of the injection interval K-3 planned to use.

K-3 responds that "[t]he surface estate includes the rights to saltwater and fresh water in the subsurface saltwater non-productive strata."[9] Although it acknowledges that Rosenthal owns one-hundred percent of the leasehold oil and gas estate, and that he has the right "to inject saltwater under the Richers tract produced from the Richers tract" to benefit that lease tract, K-3 urges that this right does not extend to using the saltwater zones, which K-3 owns, to benefit other tracts. Similarly, it argues that Rosenthal has no right to use the Richers No. 2 wellbore K-3 owns for such disposal.

The commission responds to Rosenthal by emphasizing that K-3 was not required to prove—and it had no jurisdiction to decide—whether K-3 has title to the interval it proposes to

---

[6] *See Humphreys-Mexia Co. v. Gammon*, 254 S.W. 296, 302 (Tex. 1923).

[7] *See Ball v. Dillard*, 602 S.W.2d 521, 523 (Tex. 1980); *Sun Oil Co. v. Whitaker*, 483 S.W.2d 808, 810-11 (Tex. 1972); *Getty v. Jones*, 470 S.W.2d 618, 621 (Tex. 1971).

[8] *See Brown v. Lundell*, 344 S.W.2d 863, 869 (Tex. 1961); *TDC Eng., Inc. v. Dunlap*, 686 S.W.2d 346, 348-49 (Tex. App.—Eastland 1985, writ ref'd n.r.e.).

[9] *See Robinson v. Robbins Petroleum Corp.*, 501 S.W.2d 865, 867-68 (Tex. 1973); *Whitaker*, 483 S.W.2d at 811.

16

use for disposal. *See Magnolia Petroleum Co.*, 170 S.W.2d at 190-91. K-3 met its burden of making a "reasonably satisfactory showing of a good-faith claim of ownership in the property," *id.* at 191, the commission asserts, with proof that K-3 was the surface owner of the Richers tract. It observes that "the dichotomy of interests between surface owners and mineral owners is *not* simply defined along the rigid lines of what is above ground and what is below ground," citing the example of groundwater, which has been held to be part of the surface estate, subject to the mineral leasehold estate's right to use the groundwater to the extent necessary for the enjoyment of the mineral estate.[10] Relatedly, it emphasizes that Texas courts have a long history of balancing the competing interests of surface and mineral owners and "requiring reasonable accommodations between them" that have not rigidly tracked above-ground versus below-ground lines. *Humble Oil & Ref. Co. v. West*, 508 S.W.2d 812, 815 (Tex. 1974). Finally, the commission suggests that the underlying substantive title question of "how much control a mineral owner has over the underground strata where the surface owner seeks to use a well for commercial injection of oil and gas wastes" is unsettled. However, it points to two cases relied upon by the hearing examiners that, in its view, support the proposition that the underground property K-3 intends to use for saltwater disposal are part of the surface estate, *Humble Oil & Ref. Co. v. West*, 508 S.W.2d 812 (Tex. 1974), and *Emeny v. United States*, 412 F.2d 1319 (Ct. Cl. 1969).

---

[10] *See Whitaker*, 483 S.W.2d at 811 ("[w]ater, unsevered expressly by conveyance or reservation, has been held to be a part of the surface estate"); *Guffey v. Stroud*, 16 S.W.2d 527, 528 (Tex. Comm'n App. 1929, judgm't adopted) (in absence of express reservation to surface estate owner, mineral estate owner may use surface water or groundwater to the extent necessary to the enjoyment of the mineral estate).

17

*Emeny* involved a claim for compensation by Texas surface estate owners arising from the federal government's storage of helium gas from other properties in geological formations underneath the surface owner's land. The federal government had leased the oil, gas, and mineral rights in the land from the surface owner and claimed that these rights entitled it to store the helium. The court of claims held that, to the contrary, the surface owners retained ownership of the geological structures below the surface, including those capable of storing helium. 412 F.2d at 1320-23.

In *West*, Humble Oil purchased certain land from the Wests, including both the surface and mineral rights, the latter subject to royalty interests retained by the grantors. Humble subsequently sought to use underground formations beneath the land to store "non-native" gas, or gas it brought in from other leases. Arguing that Humble had no right to do this, the Wests sought injunctive relief or, in the alternative, to have Humble account for their share of royalties on all gas produced from the land, both native and non-native. 508 S.W.2d at 813-15. The Texas Supreme Court held that Humble owned "not only the surface and mineral estates, but also the matrix of the underlying earth, i.e., the reservoir storage space, subject only to the reserved right of the Wests to the payment of royalties on minerals that are produced and saved." *Id.* at 815. In support of this holding, the supreme court cited *Emeny* for the proposition that "the surface of the leased lands remaining as the property of the respective landowners included the geological structures beneath the surface, together with any such structure that might be suitable for the underground storage of extraneous gas produced elsewhere." *Id.* The commission suggests that *West* implies that

the non-native gas stored in the reservoir storage space was not burdened by the retained royalty interest because the court viewed the space to be part of the surface estate.

Rosenthal replies that these cases are distinguishable, emphasizing that the surface owner in *West* also owned the minerals and that the surface owners in *Emeny* were also the lessors of the mineral estate. Even if Rosenthal is correct as to the title question presented here, we nonetheless conclude that substantial evidence supports the commission's conclusion that K-3 demonstrated a good-faith claim to the right to use the property at issue for saltwater disposal. Our conclusion is informed by the case law applying the good-faith-claim requirement.

We have overturned commission orders granting permits for lack of evidence of a good-faith claim where the courts had already determined the title issue adversely to the applicant's claim, *see Humble Oil & Ref. Co. v. MacDonald*, 279 S.W.2d 914, 915-16 (Tex. Civ. App.—Austin 1955, writ ref'd n.r.e.);[11] *Humble Oil & Ref. Co. v. Carr*, 243 S.W.2d 709, 711-14 (Tex. Civ. App.—Austin 1951, writ ref'd n.r.e.), or where a conveyance in the applicant's chain of title is held to be void because it violated a statute or commission rules, *see MacDonald*, 279 S.W.2d at 916; *Carr*, 243 S.W.2d at 714-15; *Cheesman v. Amerada Petroleum Co.*, 227 S.W.2d 829, 830-31 (Tex. Civ. App.—Austin 1950, no writ). We have also upheld a commission determination that an applicant failed to demonstrate a good-faith claim based on evidence suggesting subjective bad faith or dishonesty by the permit applicant with regard to whether it owned the subject property.

---

[11] *Cf. Pan Am. Prod. Co. v. Hollandsworth*, 294 S.W.2d 205, 214-15 (Tex. Civ. App.—Austin 1956, no writ) (in "reverse of [the] situation" presented in *MacDonald*, affirming commission order where court decisions had already established validity of applicant's title claim).

*See Superior Oil Co. v. Railroad Comm'n*, 571 S.W.2d 51, 53-56 (Tex. Civ. App.—Austin 1978, no writ) (emphasizing evidence that applicant's title claim contradicted its claims in previous permit applications and that survey had been conducted irregularly). In contrast, relying on the jurisdictional limitations identified in *Magnolia Petroleum*, we have rejected challenges to commission permits based on the good-faith-claim requirement where the challenge has instead turned on construction of the deed under which the applicant claims the subject property, *see Pan Am. Petroleum Corp. v. Railroad Comm'n*, 318 S.W.2d 17, 19-21 (Tex. Civ. App.—Austin 1958, no writ), or conflicting evidence from competing surveys. *See Sun Oil Co. v. Railroad Comm'n*, 390 S.W.2d 803, 805-09 (Tex. Civ. App.—Austin 1965, writ ref'd n.r.e.). Rosenthal's challenge falls into the latter category.

At bottom, Rosenthal's complaint is that the surface estate in the Richers tract that K-3 indisputably owns through its wholly owned subsidiary does not include ownership of the right to use the subterranean non-productive zones into which K-3 intends to inject salt water. Rosenthal (and K-3) present a quintessential title dispute. *See, e.g.*, *Koch v. Texas Gen. Land Office*, 273 S.W.3d 451, 454-57 (Tex. App.—Austin 2008, pet. filed) (dispute regarding whether State's mineral estate extended to limestone on the property). There is no dispute with the validity of any conveyance in K-3's chain of title, nor, as the commission observes, have the courts yet determined the title issue adversely to K-3. Resolution of Rosenthal's complaint will instead turn on construction of the deeds in K-3's chain of title—specifically, the parameters of the "surface estate" conveyed through these instruments—in the context of background law. This is the sort of issue that we have held to be beyond the commission's jurisdiction. *See Pan Am. Petroleum Corp.*,

20

318 S.W.2d at 19-21; *see also Magnolia Petroleum Co.*, 170 S.W.2d at 190-91. The question of whether Rosenthal actually owns or has the right to use the injection zone, in other words, "must be settled in the courts." *Id.* at 191.

We conclude that substantial evidence supports the commission's conclusion that K-3 "established that it possesses a good faith claim of the right to use the E. Richers No. 2 for disposal into non-productive zones." We overrule Rosenthal's first issue and the portion of his second issue pertaining to his title complaint.

**"Public interest" findings**

Also in his second issue, Rosenthal complains of deficiencies in the commission's finding of fact no. 7, which addresses whether K-3 met its burden to establish that granting the permit was in the "public interest." Repeated for the reader's convenience, finding of fact no. 7 stated:

> 7. Use of the E. Richers No. 2 as a commercial disposal well is in the public interest to provide necessary additional disposal capacity.
>
> a. Due to increased oil and gas development in Matagorda County, large quantities of produced water must be disposed of.
>
> b. Many existing producing wells in Matagorda County produce high volumes of water. Some have had shut-ins due to insufficient disposal capacity.
>
> c. Existing disposal wells in the county are periodically unavailable because they have reached capacity.

21

Rosenthal asserts that finding no. 7 "is couched in statutory terms" and is not "supported by underlying facts." *See* Tex. Gov't Code Ann. § 2001.141(d) (West 2008); *Texas Health Facilities Comm'n v. Charter Medical-Dallas, Inc.*, 665 S.W.2d 446, 450-51 (Tex. 1984). As for the underlying findings in subparts a-c, Rosenthal argues that each is "a global finding based on a general statement in the record, testimony likely true in any part of the State of Texas rather than testimony specifically related to use of the Richers No. 2 well or the Richers tract." Because of these asserted deficiencies in finding of fact no. 7, Rosenthal further contends, the commission's conclusion of law no. 4—"The use or installation of the proposed injection well is in the public interest"—is not supported by substantial evidence.

We disagree with Rosenthal's characterization of the fact findings in subparts a-c of finding of fact no. 7. Considered in context with the agency record, these findings refer to evidence presented at the hearing regarding the need for additional saltwater disposal capacity in the local area near the Richers No. 2. The hearing examiners, in their PFD, summarized this evidence as follows:

> The undisputed evidence presented by K-3 at the re-opened hearing demonstrated the need for additional disposal capacity in this area. Oil and gas development in Matagorda County is increasing, resulting in the production of more salt water. Additionally, some existing wells in the area which produce high volumes of water have been shut-in due to insufficient disposal capacity. K-3's trucking company hauled over 1.9 million barrels of produced water to the three commercial facilities in Matagorda County. Several times a month on average, the trucks would arrive at a facility and find it to be shut-down due to capacity limits. K-3 is aware that the Red Wolf Oil Company disposal facility is approaching the maximum injection pressure allowed by the permit.

There is substantial evidence to support the commission's findings nos. 7a-7c. In turn, these findings are sufficient to support the commission's finding that "[u]se of the E. Richers No. 2 as a

22

commercial disposal well is in the public interest to provide necessary additional disposal capacity," and its conclusion that "[t]he use or installation of the proposed injection well is in the public interest." *See Texas Citizens for a Safe Future & Clean Water v. Railroad Comm'n*, 254 S.W.3d 492, 504 (Tex. App.—Austin 2007, pet. filed) (en banc) (Pemberton, J., joined by three other justices, concurring in denial of reconsideration en banc) ("the existence of the Commission's statutory power to consider 'public interest' factors [under water code section 27.051(b)] does not imply how the Commission should exercise it in determining the weight any particular proffered 'public interest' consideration should be given, as informed by its judgments of fact or policy") (citing *Public Util. Comm'n v. Texas Tel. Ass'n*, 163 S.W.3d 204, 213 (Tex. App.—Austin 2005, no pet.) ("It is within the [Public Utility] Commission's authority to decide what public interest means in a particular case . . . [and it] has wide discretion in determining what factors to consider when deciding whether something serves the public interest") (citations omitted)). We overrule this remaining portion of Rosenthal's second issue.

## CONCLUSION

Having overruled both of Rosenthal's issues on appeal, we affirm the district court's judgment affirming the commission's order.

_____

Bob Pemberton, Justice

Before Justices Patterson, Pemberton and Waldrop

Affirmed

Filed:   August 20, 2009

23